# PULLMAN'S PALACE CAR COMPANY *v.* CENTRAL TRANSPORTATION COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FROM
THE EASTERN DISTRICT OF PENNSYLVANIA; AND ALSO CERTI-
ORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD
CIRCUIT.

No. 141. Argued March 24, 25, 1898.— Decided May 31, 1898.

By taking an appeal to the Circuit Court of Appeals the Pullman Company
did not, under the peculiar circumstances of this case, waive its right
to appeal to this court, and the case being now before this court either
on appeal or by the writ of certiorari, it has jurisdiction.

In order to authorize a denial of a plaintiff's motion to discontinue a suit in
equity, there must be some plain legal prejudice to the defendant, other
than the mere prospect of future litigation, rendered possible by the dis-
continuance.

Unless there be an obvious violation of a fundamental rule of a court of
equity, or an abuse of the discretion of the court, the decision of a
motion for leave to discontinue will not be reviewed here.

The decision of the Circuit Court in denying the motion of the Pullman
Company to discontinue its suit was right, as was also its decision per-
mitting the Central Company to file a cross bill.

In no way, and through no channels, directly or indirectly, will courts allow
an action to be maintained for the recovery of property delivered under
an illegal contract, where, in order to maintain such recovery, it is neces-
sary to have recourse to that contract; but the right of recovery must
rest on a disaffirmance of the contract, and is permitted only because
of the desire of courts to do justice, as far as possible to the party who
has made payment or delivered property under a void agreement, which
in justice he ought to recover, and no recovery will be permitted which
will weaken said rule founded upon the principles of public policy.

Acting upon those settled principles the court decides:

   (1) That the Central Company is entitled to recover from the Pullman
Company the value of the property transferred by it to that com-
pany when the lease took effect, with interest, as that property has
substantially disappeared, and cannot now be returned;

   (2) That the value of that property is not to be ascertained from the
market value of the shares of the Central Company's stock at that
time, but by the value of the property transferred;

   (3) That the value of the contracts with railroad companies transferred
by the Central Company form no part of the sum which it is en-
titled to recover;

(4) That the same principle applies to the patents transferred which had all expired;

(5) That it is not entitled to recover anything for the breaking up of its business by reason of the contracts being adjudged illegal.

THE record in this case shows that in 1870 the Central Transportation Company, hereafter called the Central Company, was a corporation which had been in 1862 incorporated under the general manufacturing laws of the State of Pennsylvania. It was engaged in the business of operating railway sleeping cars and of hiring them to railroad companies under written contracts by which the cars were to be used by the railroad companies for the purpose of furnishing sleeping conveniences to travellers. The corporation at this time had contracts with a number of different railroad companies in the East, principally, but not exclusively, with what is known as the Pennsylvania Railroad system, and it had been engaged in its business with those companies for some time prior to 1870. In the year last named the Pullman's Palace Car Company, hereafter called the Pullman Company, was a corporation which had been incorporated under the laws of the State of Illinois. It was doing the same general kind of business in the West that the Central Company was doing in the East. For reasons not material to detail, the two companies entered into an agreement of lease, which was executed February 17, 1870.

By its terms the Central Company leased to the Pullman Company its entire plant and personal property together with its contracts which it had with railroad companies for the use of its sleeping cars on their roads, and also the patents belonging to it. The lease was to run for ninety-nine years, which was the duration of the charter of the Central Company.

It was also agreed that the Central Company would not engage in the business of manufacturing, using or hiring sleeping cars while the contract remained in force.

In consideration of these various obligations, the Pullman Company agreed to pay annually the sum of $264,000 during the entire term of ninety-nine years, in quarterly payments, the first quarter's payment to be made on the 1st of April, 1870.

From the time of the execution. of the contract its terms were carried out, and no particular trouble occurred between the companies for about fifteen years. During this time and up to the 27th day of January, 1885, the Pullman Company paid to the Central Company, as rent under the contract, the sum of $3,960,000, without any computation of interest. About or just prior to January, 1885, differences arose between the companies. The Pullman Company claimed the right to terminate the contract under the eighth clause thereof, or else to pay a much smaller rent. The merits of the controversy are not material.

The two companies not agreeing, and the Pullman Company refusing to pay the rent stipulated for in the lease, the Central Company brought successive actions to recover the instalments of rent accruing. In one of them the Pullman Company pleaded the illegality of the lease, as being *ultra vires* the charter of the Central Company. The plea prevailed in the trial court, and upon writ of error the judgment upholding this defence was, in March, 1891, sustained in this court. *Central Transportation Company* v. *Pullman's Car Company*, 139 U. S. 24.

After the bringing of several actions for instalments of rent by the Central Company and before the question of *ultra vires* had been argued in this court, the Pullman Company on the 25th day of January, 1887, commenced this suit by the filing of its bill against the Central Company in the Circuit Court of the United States for the Eastern District of Pennsylvania. The bill asked for an injunction to restrain the bringing of more suits for rent. It gave a general history of the transactions between the companies from the execution of the contract between them in February, 1870, down to the time of the filing of the bill, and it alleged the election of the Pullman Company to terminate the lease under the provisions of the eighth clause thereof, and the willingness of the company to pay what should be found by the court to be equitable and right to the Central Company on account of the property which had been transferred by that company to it, and to this end it prayed the aid of the court. The bill also contained the following allegation:

"And your orator shows that in said lease it is recited that the said contract of lease is made on the part of the defendant, the said Central Transportation Company, under an act of the general assembly of the Commonwealth of Pennsylvania therein named, approved the 9th day of February, A.D. 1870, a copy whereof is hereto attached, marked Exhibit G, and referred to as part of this bill; but your orator is advised, and therefore submits it to the court, that the said lease being a grant, assignment and transfer of all the property, contracts and rights of the said defendant, the Central Transportation Company, and including a covenant on the part of said defendant corporation not to transact during the existence of said lease any of the business for the transaction of which it was incorporated, was never legally valid between the parties thereto, but was void for the want of authority and corporate power on the part of the defendant to make the said contract of lease, and because the same was in violation of the charter conferring the corporate powers of said defendant, and of the purpose of its incorporation, as by the said charter, to which, for greater certainty, reference is made, your orator is advised it will appear; that the said contract of lease was never susceptible of being enforced in law by your orator against said defendant, and cannot therefore be construed and held to continue in force and obligatory upon your orator; and that your orator can be under no other legal obligation or equitable duty to the defendant than to return such of the property assumed to be demised as is capable of being returned, and to make just compensation for such other of the said property as under the said contract of lease it ought to make compensation for, which it is willing and now offers to do."

In the prayer for relief it was also asked —

"That the court may consider and decree whether said contract of lease was not made without authority of law on the part of the defendant and in excess of its corporate powers and in violation of its corporate duties, so as not to be enforceable against your orator beyond the obligation of your orator to make return of or just compensation for the property

demised; and that an account may be taken between your orator and defendant, and that the amount may be ascertained that should be paid by your orator to the defendant on any account whatever; . . . and that an accounting may be had between your orator and defendant as to all the matters and things set out in this bill."

The Central Company answered the bill, denying many of the material allegations therein contained. It denied that the Pullman Company had ever elected to terminate the lease under the provisions of the eighth clause thereof, and it alleged that the lease was still in existence, and that it had the right to recover from the Pullman Company the amount of the rent named in the lease, and that no valid agreement had ever been made between the companies in any way altering the lease or reducing the amount of the rent payable thereunder. It denied that the lease was illegal, and it alleged that even if it were, the illegality did not justify the complainant in applying for any equitable relief whatever.

Upon application on the part of the Pullman Company the court granted an injunction restraining the bringing of suits for the collection of rent accruing after July, 1886, but it declined to enjoin those already pending for rent accruing before that date.

After considerable proof had been taken upon the issues involved in this suit and after the decision of the other case in this court, in March, 1891, holding the lease illegal and void, the complainant herein, on the 25th of April, 1891, applied to the court for leave to dismiss its bill at its own cost. This application was opposed by the defendant, who, on the same day, moved for leave to file a cross-bill, in which it said it would avail itself of the tenders of relief made by the complainant in its bill, and that it would pray such relief in its cross-bill as might be pertinent to the case made by the bill. In December, 1891, complainant's motion for leave to dismiss its bill was denied, and the defendant's motion for leave to file a cross-bill was granted. Thereupon the cross-bill was filed, in which the Central Company acknowledging, under the decision of this court, that the lease in question was void,

claimed to avail itself of the tenders made in complainant's bill upon the subject of the return of its property and compensation for that which it was impossible to return, and claimed, among other things, that the Pullman Company should account for all the profits which it had derived since the making of the lease by the use of the property transferred to it under the agreement, and that the amount found due should be paid to the Central Company, and that the Pullman Company should be adjudged to be a trustee for the Central Company of all the contracts for transportation, whether original, new or renewals, held by the Pullman Company with railroad companies with which there were contracts of transportation with the Central Company at the time of the making of the lease in February, 1870, and that the Pullman Company should be adjudged to pay the Central Company all such sums as should be due to it by the Pullman Company as such trustee, and that defendant should in the future from time to time account for the sums which should be due by reason of future operations under those contracts. It also prayed for a discovery and an accounting by the Pullman Company of its use and disposition of the property turned over to it by the Central Company.

To this cross-bill the Pullman Company filed three demurrers, the first being a general demurrer on the ground that the cross-bill was filed contrary to the practice of the court, and also that it appeared that the court had no jurisdiction of the case; the second demurrer related to the portions of the cross-bill praying that the cross-defendant might be regarded as a trustee and decreed to account accordingly; the third demurrer related to that part of the cross-bill which asked for an account of profits since the making of the lease and for future profits.

The demurrers were overruled with leave to present the questions on final hearing, and the Pullman Company then answered the cross-bill. Among other things it set up that the agreement in question was void, "and that being null and void between the parties hereto because of such character of the agreement, it cannot be made the lawful foundation of any

action or application for any relief whatever between the parties thereto. And this respondent submits that the rule which precludes the granting of relief by any court of either equity or law, upon a contract void for contravention of public policy, forbade this Circuit Court to allow such affirmative relief upon this cross-bill which asserts no claim of right not founded directly upon the express undertakings of this contract of lease, held void by this court itself and by the Supreme Court 'for the reasons aforesaid." The Pullman Company therefore denied that it owed any duty to the cross-complainant, which was enforceable at law or equity, to return to the Central Company the property assigned under the lease or to account for any profits derived under and by reason of any property delivered to it under the agreement.

Testimony was taken under these pleadings, and the case came before the Circuit Court for final hearing, and that court held that the cross-complainant made out a case for an accounting by the cross-defendant for the value of the property when received, together with its earnings since, less the amount paid as rent. The court, therefore, referred it to a master for the purpose of ascertaining the facts, with directions to report within the time named in the order of reference. Under this order testimony was taken and the master reported in favor of the Central Company, and the exceptions filed having been overruled, judgment was entered in favor of the Central Company for the sum of $4,235,044, together with costs. From this judgment the Pullman Company appealed directly to this court. It also appealed to the Circuit Court of Appeals. The case was there argued upon a motion to dismiss the appeal, and the motion denied, and the further argument was postponed until some disposition was made of the appeal taken directly to this court. 39 U. S. App. 307. A motion has also been made to this court to dismiss the appeal, and thereupon an application was made to us for a writ of certiorari to the Circuit Court of Appeals for the Third Circuit, and on account of the peculiar circumstances it was granted, and the record has been returned to this court by virtue of that writ.

*Mr. Edward S. Isham* and *Mr. Joseph H. Choate* for appellant. *Mr. A. H. Wintersteen* and *Mr. Robert T. Lincoln* were on their brief.

*Mr. Frank P. Prichard* and *Mr. John G. Johnson* for appellee.

Mr. Justice Peckham, after stating the facts, delivered the opinion of the court.

The motion to dismiss the appeal in this case is now before the court.

Counsel for the Pullman Company took the appeal directly from the Circuit Court to this court on the theory that the case involved the construction or application of the Constitution of the United States, because of the holding of the court below that the cause of action alleged by the Central Company in its cross-bill was, under the circumstances, a proper subject of equitable cognizance, and counsel claimed it was really nothing but a legal cause of action in regard to which the cross-defendant was entitled to a trial by jury under the Constitution of the United States. There being room for doubt in regard to the soundness of such contention, the counsel also took an appeal to the Circuit Court of Appeals, and we think that by this action he did not waive any right of appeal which he would otherwise have had. Whichever route may be the correct one, either directly from the Circuit Court or through the Circuit Court of Appeals, it is unnecessary to decide, because the case is now properly before us either by appeal or by writ of certiorari, and we therefore proceed to determine it upon the merits.

The Pullman Company, complainant in the original suit, insists that it had the right to discontinue that suit at its own cost before any decree was obtained therein, and the refusal of the court below to grant an order of discontinuance upon its application is the first ground of objection to the decree herein.

The general proposition is true that a complainant in an

equity suit may dismiss his bill at any time before the hearing, but to this general proposition there are some well recognized exceptions. Leave to dismiss a bill is not granted where, beyond the incidental annoyance of a second litigation upon the subject-matter, such action would be manifestly prejudicial to the defendant. The subject is treated of in *Detroit* v. *Detroit City Railway Company*, in an opinion by the Circuit Judge, and reported in 55 Fed. Rep. 569, where many of the authorities are collected, and the rule is stated substantially as above. The rule is also referred to in *Chicago & Alton Railroad* v. *Union Rolling Mill Co.*, 109 U. S. 702.

From these cases we gather that there must be some plain, legal prejudice to defendant to authorize a denial of the motion to discontinue; such prejudice must be other than the mere prospect of future litigation rendered possible by the discontinuance. If the defendants have acquired some rights which might be lost or rendered less efficient by the discontinuance, then the court, in the exercise of a sound discretion, may deny the application. *Stevens* v. *The Railroads*, 4 Fed. Rep. 97, 105. Unless there is an obvious violation of a fundamental rule of a court of equity or an abuse of the discretion of the court, the decision of a motion for leave to discontinue will not be reviewed here.

Upon an examination of the facts relating to the motion, we think the Circuit Court was right, in the exercise of its discretion, in denying the same. The original bill was framed really on two theories: One, that by reason of an election made under the eighth clause in the lease, the Pullman Company had terminated the lease, and it was therefore bound under its provisions to return the property which it had received from the Central Company. It stated in its bill the impossibility of returning a large portion of the property which it had received; it announced its willingness to make substantial performance of its contract contained in the lease, and it asked the court to aid it therein by decreeing exactly what it should do for the purpose of carrying out equitably and fairly its obligations incident to its termination of the lease under the clause above mentioned. The other theory rested upon what

was a substantial allegation of the invalidity of the lease as having been made without authority of law, and therefore in violation of the corporate duties of the Central Company, and on that account not enforceable against the Pullman Company beyond the obligation of the latter company to make return of just compensation for the property demised. Upon that theory the bill asked, not that the court should set aside or cancel the lease, but that it should aid the parties by decreeing just what relief should be given by the complainant to the lessor in the execution of its duty to make some compensation for the property it received and which it stated its willingness to make, and to that end, that an accounting might be had and the amount ascertained that should be paid to the Central Company in discharge of the obligations of the complainant in that behalf. Thus the Pullman Company came into a court of equity and in substance alleged that the lease had been terminated by it under the eighth clause, and it also alleged that the lease was void as *ultra vires,* and in either event it tendered such relief as the court might think was proper and fair under the circumstances.

A large amount of proof had been taken under the issues made in this original bill and the answer thereto, and before the case was concluded the decision of this court was made in which the lease was declared to be void. The only obligation left under the original bill of complainant after the decision of this court, was the obligation to return such portion of the property received by it as the court should determine to be right, or to make some compensation to the Central Company for the same. And this obligation it had offered in the original bill to carry out.

The Pullman Company had also obtained an injunction in the original suit, restraining the Central Company from commencing further legal proceedings to recover rent under the lease, and after obtaining this injunction and taking the testimony relating to the subject-matter of the original bill, the complainant should not be permitted under these circumstances to dismiss that bill and thus withdraw the whole case from the jurisdiction of the court, and thereby blot out

its tenders of relief contained in its original bill grounded, among others, upon the allegation that the lease was void, and asking the aid of the court to decree the precise terms upon which its obligations to the Central Company might be fulfilled.

The denial of the motion was made in connection with the application of the Central Company to file a cross-bill in which it would seek to avail itself of the tenders made by the Pullman Company in the original bill. Such an application for leave to file a cross-bill seeking affirmative relief while at the same time availing itself of those tenders of relief made by the original complainants, would furnish additional ground for the exercise of the discretion of the court in refusing to grant the application for leave to discontinue. We think there was no error committed by the court below in refusing the leave asked for.

The further objection is made by the counsel for the Pullman Company that it was error to allow the cross-bill to be filed in this case. Counsel for the Pullman Company assert that the cause of action for a return of the property is a purely legal one of which a court of equity has no jurisdiction, and that it can acquire none simply by the filing of a cross-bill. Whatever may be the original character of the liability of the Pullman Company to return or make compensation for the property, we are of opinion that under the facts above set forth it cannot object to the filing of the cross-bill, or to the determination of the amount of its liability by a court of equity. It had itself voluntarily appealed to the jurisdiction of such a court for the purpose of obtaining its aid in decreeing the terms upon which its obligations to the Central Company might be fulfilled and the lease terminated, either under the eighth clause in the lease or because of its invalidity as being *ultra vires*. Having thus appealed to equity for its aid and the lease having been conclusively determined to have been void, we think it was within the fair discretion of the court to retain jurisdiction of the cause and of the original complainant, and to permit the filing of a cross-bill in which the cross-complainant might seek affirmative relief, and at the same time

avail itself of the tenders made by the complainant in its original bill.

The facts which were set up in the cross-bill closely affected one of the theories upon which the original bill was filed, viz., the invalidity of the lease. They were relevant to the matters in issue in the original suit, and in seeking affirmative relief the cross-complainant is but amplifying and making clearer the foundations for the intervention of equity which had been appealed to by the Pullman Company, and the continued intervention of which would greatly speed a final termination of all matters for litigation between the parties. The court below did not err in permitting the cross-bill to be filed.

This brings us to a discussion of the principles upon which a recovery in this case should be founded. The so called lease mentioned in this case has been already pronounced illegal and void by this court. 139 U. S. 24. The contract or lease was held to be unlawful and void because it was beyond the powers conferred upon the Central Company by the legislature, and because it involved an abandonment by that company of its duty to the public. It was added that there was strong ground also for holding that the contract between the parties was void because in unreasonable restraint of trade, and therefore contrary to public policy. In making the lease the lessor was certainly as much in fault as the lessee. It was argued on the part of the Central Company that even if the contract sued on were void, yet that having been fully performed on the part of the lessor and the benefits of it received by the lessee for the period covered by the declaration in that case, the defendant should be estopped from setting up the invalidity of the contract as a defence to the action to recover compensation for that period. But it was answered that this argument, though sustained by the decisions in some of the States, finds no support in the judgments of this court, and cases in this court were cited in which such recoveries were denied.

It is true that courts in different States have allowed a recovery in such cases, among the latest of which is the case of *Bath Gas Light Co.* v. *Claffy*, 151 N. Y. 24, where Chief

Judge Andrews of the Court of Appeals examines the various cases, and that court concurred with him in permitting a recovery of rent upon a void lease where the lessee had enjoyed the benefits of the possession of the property of the lessor during the time for which the recovery of rent was sought.

But in the case of this lease, now before the court, a recovery of the rent due thereunder was denied the lessor, although the lessee had enjoyed the possession of the property in accordance with the terms of the lease. It was said (page 60 of the report in 139 U. S.), " the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties so far as could be done consistently with adherence to law, by permitting property or money parted with on the faith of the unlawful contract to be recovered back or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract nor according to its terms, but on an *implied contract* of the defendant to return, or failing to do that, to make compensation for the property or money which it had no right to retain. To maintain such an action was not to affirm, but disaffirm, the unlawful contract." And the opinion of the court ended with the statement that, " Whether this plaintiff could maintain any action against this defendant, in the nature of a *quantum meruit*, or otherwise, independently of the contract, need not be considered, because it is not presented by this record and has not been argued. This action, according to the declaration and evidence, was brought and prosecuted for the single purpose of recovering sums which the defendant had agreed to pay by the unlawful contract, and which, for the reasons and upon the authorities above stated, the defendant was not liable for."

The principle is not new; but, on the contrary, it has been frequently announced, commencing in cases considerably over a hundred years old. It was said by Lord Mansfield, in *Holman* v. *Johnson*, 1 Cowper, 341, decided in 1775, that "the objection that a contract is immoral or illegal as between the plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that

the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: *ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."

The cases upholding this doctrine are numerous and emphatic. Indeed, there is really no dispute concerning it, but the matter of controversy in this case is as to the extent to which the doctrine should be applied to the facts herein. Many of the cases are referred to and commented upon in the opinion delivered in the case in 139 U. S. 24, already cited. The right to a recovery of the property transferred under an illegal contract is founded upon the implied promise to return or make compensation for it. For illustrations of the general doctrine as applied to particular facts we refer in the margin to a few of the multitude of cases upon the subject.[1]

They are substantially unanimous in expressing the view that in no way and through no channels, directly or indirectly, will the courts allow an action to be maintained for the recovery of property delivered under an illegal contract where, in order to maintain such recovery, it is necessary to have recourse to that contract. The right of recovery must rest upon a disaffirmance of the contract, and it is permitted only because of the desire of courts to do justice as far as possible to the party who has made payment or delivered property under a void agreement, and which in justice he ought to recover. But courts will not in such endeavor permit any

---

[1] *Coppell* v. *Hall*, 7 Wall. 542; *Spring Company* v. *Knowlton*, 103 U. S. 49; *Logan County Bank* v. *Townsend*, 139 U. S. 67; *St. Louis &c. Railroad Company* v. *Terre Haute &c. Railroad Company*, 145 U. S. 393, at 408, 409; *Manchester & Lawrence Railroad Company* v. *Concord Railroad Company*, 66 N. H. 100; *White* v. *Franklin Bank*, 22 Pick. 181; *Utica Insurance Company* v. *Cadwell*, 3 Wend. 296; *Atcheson* v. *Mallon*, 43 N. Y. 147; *Leonard* v. *Poole*, 114 N. Y. 371; *Snell* v. *Dwight*, 120 Mass. 9; *Davis* v. *Old Colony Railroad*, 131 Mass. 258; *Holt* v. *Green*, 73 Penn. St. 198; *Johnson* v. *Hulins*, 103 Penn. St. 498; *Thomson* v. *Thomson*, 7 Ves. 470; *Sykes* v. *Beadon*, L. R. 11 Ch. Div. 170; *Brooks* v. *Martin*, 2 Wall. 70.

recovery which will weaken the rule founded upon the principles of public policy already noticed.

We may now examine the record herein and learn the grounds for the recovery which has been permitted, and determine therefrom whether the judgment in favor of the Central Company should be in all things affirmed, or if not, then how far the liability of the cross-defendant extends, and, if possible, what should be the amount of the judgment against it.

In referring the case to the master for the purpose of taking the account between the parties the learned District Judge stated the principle upon which the liability of the cross-defendant rested. He said:

"The property must therefore be returned or paid for. The former is impossible. The property has substantially disappeared. It has become incorporated with the business and property of the plaintiff, and cannot be separated. Compensation must therefore be made. What, then, is the measure of compensation? Clearly, we think, the value of the property when received, together with its earnings since, less the amount paid as rent. In ascertaining the value the annual rental may be considered, but it does not afford a conclusive nor an entirely safe measure of value, because the unlawful consideration (that the Central Company would abstain from exercising its franchises) entered into it. For the same reason the earnings cannot be measured by the rent. The value of the property and earnings must be ascertained from a careful examination of the property, the business and its earnings at the time they passed into plaintiff's hands and subsequently. It is not their value to the plaintiff we want, but to the defendant; in effect, what is lost by parting with them. The value of both property and earnings may have been worth more to the plaintiff with the business united, but this cannot be considered."

Acting under these directions of the court, the master in his opinion said:

"Passing to the consideration of the main question raised in the present reference, viz., what the Central Transportation Company lost by the transfer of its property to the Pullman

Company, the measure of damages as determined by the court requires the master to ascertain:

"(1.) What was the value to the Central Transportation Company in 1870 of the property transferred?

"(2.) What was earned by the Pullman Company between January 1, 1870, and January 1, 1885, from the use of the property transferred?

"(3.) The difference between the amount so received by the Pullman Company and the rental paid by it to the Central Transportation Company for the above period.

"(4.) The total amount to be paid by the Pullman Company, as of January 1, 1885, deduced as above, together with interest thereon from January 1, 1885, to date of final decree."

The master proceeded to determine the value in 1870 of the property then transferred. In ascertaining it he said:

"The value of the stock on the street is a positive indication of the estimate placed on the property by the public. That it is not entirely a satisfactory measure of value must be conceded, but in the judgment of the master, supported as it is by the best independent estimate that the evidence affords, it should be accepted as the fairest criterion of value."

He accordingly reported the value of the property when received as $58 a share, (the par value being $50 per share or a total par value of $2,200,000,) making the total market value of the shares $2,552,000, which sum he reported as the value of the property transferred.

When the report came before the court, exceptions having been taken, among other things, to the findings of the value of the property when delivered, the court said:

"It is the value of the property at the time it should have been returned that the Pullman Company should be charged with. Inasmuch as this value would be difficult of ascertainment by the transportation company except by reference to the value in 1870, it was considered proper to direct the inquiry to the latter date. Presumably the value increased; the evidence fully justifies the presumption. If it decreased, the Pullman Company could and should have shown it. The

master's valuation in 1870 is therefore to be taken as the value in 1885, when the property should have been returned. The payment of this sum, with interest from January 1, 1885, seems necessary to a just settlement, treating the value of the use and the rents paid prior to that date as balancing each other. A decree may be prepared accordingly, dismissing the exceptions and confirming the report."

Judgment based upon the value of the property at $2,552-000 on the 1st of January, 1885, with interest from that time was therefore entered, and it amounted, as stated, to the sum of $4,235,044.

We are of opinion that the court erred in the manner of ascertaining the value of the property transferred by the Central Company. The market value of its stock was not a proper measure of the value of the property, and such error resulted in largely increasing the supposed value of the property which the cross-defendant was under liability to account for.

The capital stock of this corporation had been increased from an original amount of $200,000 in 1862 to $2,200,000 in 1870. During this time it had been doing an increasing and a profitable business, and it was supposed that such business might increase in the future. The market price of the shares of stock in a manufacturing corporation includes more than the mere value of the property owned by it, and whatever is included in that price beyond and outside of the value of its property is a factor which in a case like this cannot be taken into consideration in determining the liability of the cross-defendant. Whatever that something may be it is not that kind of property which was delivered or that can be returned or compensation made in lieu of its return. It is not property at all within the meaning of the word as understood in such a case as this. The value of the franchise for one thing enters into the computation of market value. This was, of course, not assigned to the Pullman Company, nor were the shares of the capital stock of the Central Company, all of which remained in the hands of its original owners. The probable prospective capacity for earnings also enters largely into

market value, and future possible earnings again depend to a great extent upon the skill with which the affairs of the company may be managed. These considerations, while they may enhance the value of the shares in the market, yet do not in fact increase the value of the actual property itself. They are matters of opinion upon which persons selling and buying the stock may have different views. A liability to return or make compensation for property received cannot be properly extended so as to include other considerations than those of the actual value of that property.

In this particular case a consideration entering into the market value of the shares must have been the probability or possibility of renewals of the contracts owned by the company for the use of its cars upon the railroads of the companies with which it had such contracts and the possibility of extending its business in the future under contracts with other railroads. These considerations, while they affect more or less the value in the market of the shares of a corporation, do not constitute the value of the property which a party impliedly promises to pay for upon the agreement being determined void under which the property was received. The faith which a purchaser of stock in such a company has in the ability with which the company will be managed, and in the capacity of the company to make future earnings, may be well or ill founded. It is but matter of opinion which in itself is not property. While the value of the property is one of the material factors going to make up the market value of the stock, yet it is plainly not the sole one. Mere speculation has not uncommonly been known to exercise a potent influence on the market price of stock. The capacity to make any future earnings in this case by the lessee arose out of the transfer of the property to it and grew out of the lease itself, and that capacity would therefore be partly founded upon the illegal contract and could not otherwise exist.

As the market value of the shares of this stock was made up to some extent, at least, of certain factors which the lessee cannot, under the rules of law, be held responsible for in this case, it follows that such value cannot furnish a safe guide in

measuring the responsibility of the lessee in an utterly void lease. The court therefore erred in taking the market value of the shares of this stock as a proper or just measure of the value of the property transferred.

We must therefore take the property that actually was transferred and determine its value in some other way than by this resort to the market price of the stock. The property transferred consisted (*a*) of cars, bedding, etc.; (*b*) contracts which the Central Company owned with railroad companies for the use of its cars on their roads; (*c*) patents covering the construction and use of sleeping cars owned by the Central Company and by it transferred under the lease to the Pullman Company; and (*d*) $17,000 in cash. It seems to us these values must be taken separately, because, for reasons hereafter suggested, the value of the contracts and patents does not enter into the problem.

As to the value of the cars. We agree with the court below that it is now impossible to decree their return, for the reasons stated. They have substantially disappeared. The property has become incorporated with the business and property of the Pullman Company. Compensation therefore must be made. The master found that the value of the cars as vehicles, together with their equipment, at the time of the transfer, was $710,846.50. This is probably a pretty high figure judging from the whole evidence in the case upon that subject, yet still we are inclined to think that the master was justified in arriving at that sum. We take this value for the reason that the Pullman Company agreed in the lease to keep the cars in good order and repair, and renewed and reconstructed as often as might be needful during the whole term of the lease. During the fifteen years elapsing from 1870, up to January, 1885, no violation of the terms of the lease by either party is complained of, and we think the whole transaction between the parties during those fifteen years must be treated as closed, so that no examination should be made in regard to anything that happened within that time. We must assume the provisions of the lease were fully carried out by both parties, particularly as no complaints were made

of non-performance. We therefore assume that the cars were kept in good order, and when necessary were reconstructed and renewed up to January, 1885. The value at that time may be taken to be as great as the master found it to be for 1870. It is very probable the assumption is not in accordance with the fact, and that the property had greatly depreciated. But as we refuse to look into the transactions between the parties during that period, we will hold the value in 1885 to have been the same as in 1870, on the presumption that the Pullman Company fulfilled its obligations between those dates. What rule of compensation should be deduced from such finding will be alluded to hereafter.

We next come to consider the various contracts. They were entered into with different railroad companies for certain definite periods, and their time of expiration was stated in the contracts themselves. They were valuable only as they were used by the lessee, and its right to use them sprang from and was determined by the lease itself. They were assigned to the lessee for the purpose of enabling it to avail itself of the rights therein created and to use the cars with the consent of the railroads to which the contracts applied. Whether any use was made of these contracts or not they became daily less valuable as they daily neared their termination. The use made of them did not impair their value. The passage of time did that. The rental that was paid by the lessee included compensation for use, and to that extent the transaction was closed and the compensation paid up to the time when the contracts themselves had expired, which was prior to the time when the lease was declared void and payment of rent ceased. There is no principle with which we are familiar that will permit the value of those contracts when assigned to the Pullman Company to enter into and form a part of the value of the property for which the company is to make compensation, when from the nature of the thing itself, its value necessarily, and from the simple passage of time, decreased daily, and upon the arrival of the date named for the expiration of the contract it ceased to have any value.

We think the contracts were not extended by the legislative

extension of the charter of the Central Company by the act of 1870. Some of these contracts were to last during the corporate life of the Central Company. At the time they were made the charter of the company would expire in twenty years from December 30, 1862, or on December 30, 1882. We do not think the contracts meant that they were to cover any further time to which the legislature might thereafter extend the charter of the company. Some language to that effect would have been contained in the contracts if such had been the meaning of the parties. All the contracts had therefore expired by the end of 1882.

Now upon what principle can it be urged that the lessee should compensate the lessor for the value of these contracts when delivered to it when it had paid for the use, and the property was of such a nature that it became valueless by mere limitation of time? In 1885 they had gone out of existence, and, of course, had no value. The basis for a recovery of property or compensation for its value, in cases of illegal agreements, rests upon the implied contract to return it or pay for it, because there is no right in the party in possession to retain it. If at the time when otherwise it would or ought to be returned it has ceased to exist by virtue of the termination of its legal existence, how can it be returned? How can a promise to return or make compensation therefor be implied in the case of a contract having but a limited time to run, and the value of which diminishes daily until the contract itself and its value are wholly extinguished by expiration of time, and where the use of this intangible right during its existence was fully paid for by the party to whom it was assigned? There is no implication of a promise to make any further compensation for such a species of property than is made by paying for its use while it remained in legal existence. When that time expired the value was gone, and while it lived it had been paid for.

We have been able to find no case where any principle was laid down which would authorize or justify a recovery of the value of property at the time of delivery, which, before its return became proper, had passed out of existence by limita-

tion of time, and the use of which was paid for during its lifetime.

What other contracts may have been made by the Pullman Company with railroad companies would form no factor in the value of the contracts assigned. If others were obtained, they had never been the property of the Central Company, and the latter could only make a pretence of a claim in regard to them by virtue of and through the illegal contract. A resort to the illegal instrument cannot be permitted for the purpose of sustaining any recovery.

The same may be said of the patents which the Central Company also undertook to transfer, as they had all expired before January, 1885. They simply protected the use of the cars which had been constructed under them, and they diminished in value as each day brought them nearer to their expiration, and when that time arrived they were absolutely valueless. During all that time they were included in the consideration for the payment of rent made by the Pullman Company under the terms of the lease. The contracts and the patents must be eliminated from the value of the property.

Nor can we accede to the view that the Pullman Company is liable for the earnings of the property which it realized by means of putting such property to the very use which the lease provided. It had the right while both parties acquiesced to so use the property.

There is no question of trustee in the case. *Root* v. *Railway Company*, 105 U. S. 189, 215.

The property was placed in its hands by the lessor and in accordance with the terms of the agreement. It was not then impressed with any trust according to any definition of that term known to us. Although the title did not pass and was not intended to pass, the lessee did nothing with the property other than was justified by the lease. His liability is based only upon an implied promise to return or make compensation therefor. This implication of a promise would not arise until one or the other party chose to terminate the lease, for the law implies such promise in order only that justice, so far as possible, may be done. So long as neither party takes

any objection to the agreement, and both carry it out, there is no room for any differences, and no promise to return the property or make compensation is necessary, and none is therefore implied. The use of the property is lawful as between the parties, so long as the lease was not, repudiated by either, and the rent compensates for the use. After the repudiation the promise is then implied, and it is fulfilled by the payment of the value of the property at the time the promise is implied and interest thereon from that time.

As to the claim of the lessor that its business has been broken up, its contracts with railroads terminated and the corporation left in a condition of inability to again take up its former plans, and that all this should be regarded in, the measure of the relief to which it should be entitled, the same considerations which we have already adverted to must be entertained. These are results of the illegality of the contract entered into between these parties, and its subsequent repudiation on that ground, and in regard to such illegality the Central Company is certainly as much in the wrong as the cross-defendant herein. The former knew the extent of its obligations under its charter as well as the latter did, and the illegal provisions of the lease were quite as much its doings as they were those of the cross-defendant. To grant relief based upon these facts would be so clearly to grant relief to one of the parties to an illegal contract, based upon the contract itself or upon alleged damages arising out of its non-fulfilment, that nothing more need be said upon that branch of the subject. It is emphatically an application of the rule that in such a case the position of the defendant is the better.

We conclude that the cross-defendant is not liable for the contracts and patents transferred, nor for the possible damage the Central Company may have sustained, as above stated. It is liable for the value of the cars, furniture, etc., transferred. It is a liberal estimate of the value of this property to say that it amounted in 1885 to as much as it did in 1870, yet we are disposed to deal in as liberal a manner with the cross-complainant as we fairly may, while not violating any settled principle of law, in order to give to it such measure of

relief as the circumstances of the case seem to justify. We therefore take the value of the property in the cars, etc., in 1885 at the sum of $710,846.50. To that, we think, should be added the $17,000 cash received from the Central Company, making a total of $727,846.50 and interest from January 1, 1885, for which the cross-defendant is liable, together with costs.

Although the Central Company may have been injured by the result of this lease, yet that is a misfortune which has overtaken it by reason of the rule of law which declares void a lease of such a nature, and while the company may not have incurred any moral guilt it has nevertheless violated the law by making an illegal contract and one which was against public policy, and it must take such consequences as result therefrom.

The judgment appealed from must be

*Reversed and the case remitted to the Circuit Court for the Eastern District of Pennsylvania, with directions to enter a judgment for the Central Transportation Company in accordance with this opinion.*

MR. JUSTICE HARLAN dissented.

MR. JUSTICE WHITE dissented on the ground that the judgment appealed from was for the correct amount and should not be reduced.