## STANDARD SAVINGS & LOAN ASS'N v. ALDRICH.

(Circuit Court of Appeals, Sixth Circuit. July 23, 1908.)

No. 1,788.

1. MOTIONS—CREDITORS' SUIT—ORDER FIXING AMOUNT OF CLAIM—POWER TO SET ASIDE.

In a creditors' suit an order fixing the amount of an intervener's claim is interlocutory only and may be set aside for good cause shown at any time before the close of the term at which final decree in the cause is entered.

2. BUILDING AND LOAN ASSOCIATIONS—POWERS—SUBSCRIBING FOR STOCK OF ANOTHER ASSOCIATION.

A building association, organized under a statute permitting such associations to be created "for the purpose of building and improving homesteads and lending money to the members only," has no power to become a shareholder in another similar association organized under the same statute, nor can the latter lawfully lend it money as such shareholder.

3. SAME—POWER TO BORROW MONEY.

A building association, organized under a statute providing that "not more than one-half of the funds received by the association in any one month shall be applied to the payment of withdrawing shareholders unless otherwise ordered by the directors; and when the demands of withdrawing shareholders exceed the funds applicable to their payment they shall be paid in the order in which their notice of withdrawal has been given"—has no power, express or implied, to borrow money to meet the claims of withdrawing shareholders, and a contract for a loan to be so used, with the knowledge of the lender, is ultra vires and cannot be enforced.

4. CORPORATIONS—LIABILITY FOR MONEY BORROWED—ULTRA VIRES CONTRACT.

To entitle a lender of money to a corporation on an illegal contract to recover the same as money received and which in equity it ought not

to retain, the burden rests upon the lender to prove that the corporation benefited by such money, either by acquiring property which it retains or by expending it in the payment of legal obligations.

**5. BUILDING AND LOAN ASSOCIATIONS.**

Intervener lent the defendant, a building association, which was insolvent, money to be used. and which was used, in paying off withdrawing shareholders, taking as security notes and mortgages. The association had no power to borrow money for such purposes, nor to pay withdrawing shareholders when insolvent. *Held*, that intervener could not recover the money so lent, either upon the contract or in equity.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This is an appeal from a decree dismissing a petition filed by an intervener in a creditor's suit pending in the Circuit Court. The Standard Savings & Loan Association and the Michigan Savings & Loan Association are two corporations organized under the general law of Michigan providing for the creation of building and loan companies. The Michigan Association became insolvent. Under a general creditors' bill filed in the Circuit Court, diversity of citizenship existing, a receiver was appointed, its assets impounded, and the creditors who desired to share in the distribution of assets required to file their claims  Among the creditors who came in by intervention to assert a claim was the Standard Savings & Loan Association. The claim, as stated in the petition, was for money loaned, originally aggregating $65,000, which, by credits, had been reduced on April 1, 1901, to $46,103.67. To secure this indebtedness it was averred that the Michigan Association had assigned certain real estate mortgages made to it by borrowing members. These securities, the petitioner consenting, were turned over to the receiver; the order providing that such lien as the Standard Association had against them should be transferred to the fund which should be realized from their collection by the receiver. A decree, by consent of the receiver, was entered July 1901, fixing the amount of the indebtedness of the Michigan Association to the Standard Association on account of the transaction referred to at $44,240.33, but reserving any question of the "status" of the claim or interest. In July, 1904, this order was vacated so far as it determined any indebtedness, and the receiver allowed to withdraw his answer and to file defenses to the claim. Upon a final hearing the judge denied all relief and dismissed the intervening petition.

D. C. Rexford, for appellant.

De Forest Paine, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge (after stating the facts as above). 1. There was no error in vacating the order determining the indebtedness of the Michigan Association to the Standard Association. Although the order was made at a subsequent term, yet the order set aside was not final, but interlocutory, and, upon good cause shown, might be set aside at any time before the close of the term at which the final decree was enrolled. Loeser, Trustee, etc., v. Savings Bank (decided at this session) 163 Fed. 212. The facts upon which the court acted in setting aside that order and allowing defense to be made to the claim amply justified the action of the court.

2. The origin of the debt in question was this: In November, 1897, the Michigan Association, though still a going concern, was in fact insolvent, and much in need of money to satisfy demands of withdrawing shareholders. In this emergency it applied to the Standard

Association for assistance. The negotiations were carried on by their respective secretaries, Galvin for the Standard Association and Wemple for the Michigan Association. These secretaries were the real managers of these associations and, to quote counsel, "were the whole thing." The evidence makes it plain that the purpose of the Michigan Association in borrowing was to pay off importunate withdrawing shareholders, and this purpose was as well known to the lender as the borrower. Indeed, Mr. Galvin, the man of all work for the Standard Association, and the negotiator of the loans, admits that the original plan was that the money loaned should be paid direct to such withdrawing shareholders, and that he therefore paid to himself, in his character of withdrawing shareholder, $3,500, but did not carry out the scheme of direct payments further because of bookkeeping complications. To carry out the arrangement the Michigan Association subscribed to the requisite number of shares in the Standard Association, and upon the footing of a shareholder applied for and obtained the loans in question, using same as stated above. That the Michigan Association had no power to become a shareholder in the Standard Association is not disputed. The enabling act under which both associations were organized provides that such companies may be created "for the purpose of building and improving homesteads and lending money to the members only." Comp. Laws Mich. 1897, §§ 7554, 7581. The investment of funds in the shares of a company organized for a like purpose is beyond the scope of the most liberal view of the incidental or implied powers of such companies. The objects of such associations being only to lend the funds contributed by members for the purpose of building and improving homesteads, one such association could not become a member of another, nor could it lend its own funds except to its own members for the purpose indicated. The concession therefore that the Michigan Association could not legally become a member of the Standard Association, and that the latter could not legally lend its money to an association which was not and could not lawfully become a member, has not been inadvertently made. Thompson on Building Associations (2d Ed.) p. 215, § 114; 4 Am. & Eng. Enc. of L. (2d Ed.) p. 1028; Kadish v. Garden City Loan Ass'n, 151 Ill. 531, 38 N. E. 236, 42 Am. St. Rep. 256; North Am. Building & Loan Ass'n v. Sutton, 35 Pa. 463, 78 Am. Dec. 349; Mechanics' Association v. Agency Co., 24 Conn. 159.

The question as to whether, in the absence of statutory authority, such an association has the power to borrow money for the legitimate purposes of the association, such as to pay maturing shares and thereby avoid recalling or assigning profitable investments, has not often arisen and need not be here decided. The English authorities need to be distinguished, for they turn, in the main, upon whether the loans were made in accordance with rules adopted by the association made by authority of the general enabling acts. In Murray v. Scott, 9 App. Cas. 519, 538, it was held that the incorporating act having given power to the members to make rules and regulations for the conduct of the business, not in conflict with the objects and purposes of the society or the terms of the act, was broad enough to

sustain a rule allowing the managers to borrow for the legitimate purposes of the business; but such a power, resting upon implication, is not an unlimited power to borrow. In the case just cited, the Earl of Selborne very well said:

"The only real and true limit of the rule making power, as to a matter not governed by the general law of the realm or by any express prohibition in the statute, must be that pointed out by Gifford, L. J. The power cannot be so exercised as to make the society a thing different from a benefit building society formed for the purpose and in the manner defined by the act."

In Cunliffe Brooks Co. v. Blackburn & District Benefit Society, L. R. 9 App. Cas. 857, it was held upon full consideration that, when no rule allowing borrowing had been adopted, overdrafts were borrowings and ultra vires. The matter is generally regulated by statute in the United States, and in Wilson v. Parvin, 119 Fed. 652, 56 C. C. A. 268, we held that under the Tennessee incorporating act such associations had power to borrow for the legitimate purpose of their business. The Michigan statute providing for such associations confers no power to borrow, but does not in terms prohibit such transactions. If the Michigan Association had any such power, it arises by necessary implication and must therefore be limited to the necessary and legitimate purpose of the organization, as defined in the enabling act. Goss v. Peters, 98 Mich. 112, 57 N. W. 28, construing an act defining the powers of mutual fire insurance companies, points clearly to a very narrow power of borrowing by such associations as those here involved, if any such power exists under any circumstances. 4 Am. & Eng. Enc. of Law, 1023; North Hudson Bldg. Ass'n v. Hudson National Bank, 79 Wis. 31, 47 N. W. 300, 11 L. R. A. 845; Blackburn Building Ass'n v. Cunliffe Brooks Co., L. R. 22 Ch. Div. 61, 70. The members of the Michigan Association had adopted no rules authorizing the managers to borrow money for any purpose; but, assuming that the corporation had an implied power through its directors and managers to borrow money, it was a power limited to the necessary and legal purposes and objects of the business. The known and assumed purpose for which this money was borrowed was to pay off withdrawing members. Of this purpose the lending association had full notice through its secretary, by whom the whole matter was arranged and negotiated. The evidence makes this clear, and we so find the fact to be. The power to borrow money to pay off withdrawing stockholders cannot be legitimately inferred or implied. The scheme of the enabling act, as indicated by the general purpose of such associations as well as by the terms and conditions under which shareholders are allowed to withdraw dues paid in and a proportionate share of the profits earned, is that only current income shall be so applied. The withdrawal of a shareholder is the withdrawal of capital pledged primarily to creditors and to carry on the business for which the association was organized. The funds applicable therefore to the payment of withdrawing shareholders is the fund arising from the current contributions of a solvent and going association, and no other funds can be legitimately so applied. This we think plain from the relation of shareholders to such associ-

ations and is plainly indicated by the proviso of the sixth section of the enabling statute:

"That not more than one-half of the funds received by the association in any one month shall be applicable to the payment of withdrawing shareholders unless otherwise ordered by the directors; and when the demands of withdrawing shareholders exceed the funds applicable to their payment they shall be paid in the order in which their notice of withdrawal has been given."

We conclude therefore that no authority existed, express or implied, to borrow money to meet the claims of withdrawing shareholders. Such a borrowing would not be for the purpose of paying debts and liabilities in due course of business. Blackburn Building Society v. Cunliffe Brooks Co., L. R. 22 Ch. Div. 61, affirmed in L. R. 9 App. Cas. 857. Appellants, as we have before stated, had notice that the borrowing was for the payment of withdrawing shareholders and are constructively charged with knowledge that the managers were acting without power in so doing and in assigning the mortgages of borrowing shareholders to secure the loan. A contract beyond the scope of the power of the Michigan Association, express or implied, cannot be enforced by an appeal to the rules of estoppel. Any such application of the doctrine would be, in effect, to enlarge the power of the corporation in accordance with the discretion of its managers, violating thereby the rights of innocent shareholders and a sound public policy. Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 60, 11 Sup. Ct. 478, 35 L. Ed. 55; Railway Co. v. Keokuk Bridge Co., 131 U. S. 371, 389, 9 Sup. Ct. 770, 33 L. Ed. 157; Miller v. Insurance Co., 92 Tenn. 167, 176, 21 S. W. 39, 20 L. R. A. 765; McCormick v. Market Bank, 165 U. S. 538, 549, 17 Sup. Ct. 433, 41 L. Ed. 817; Nat. Permanent Benefit Building Society v. Williamson, L. R. 5 Ch. App. 309; California Bank v. Kennedy, 167 U. S. 363, 368, 17 Sup. Ct. 831, 42 L. Ed. 198. In McCormick v. Market Bank, cited above, the court said:

"The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its corporate powers, is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders, not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law. Pearce v. Madison & Indianapolis Railroad, 21 How. 441, 16 L. Ed. 184; Pittsburgh, etc., Railway v. Keokuk & Hamilton Bridge Co., 131 U. S. 371, 384, 9 Sup. Ct. 770, 33 L. Ed. 159; Central Transportation Company v. Pullman's Palace Car Co., 139 U. S. 24, 48, 11 Sup. Ct. 478, 35 L. Ed. 55."

More than this, the Michigan Association was insolvent at the time. This fact, without more, suspended the power and right of the directors to apply any funds to the payment of withdrawing shareholders. This we held in regard to this very association in Aldrich v. Gray, 147 Fed. 453, 77 C. C. A. 597, where we held that the receiver might recover the funds so illegally paid out to such shareholders. That it is not shown that the appellant company knew that insolvency existed when the first loan was made in November, 1897, may, for the

purpose of this case, be conceded; but, when the last $40,000 was paid over, it had constructive knowledge, for it had caused its own treasurer, Mr. Wilson, to be placed in the board of directors of the borrowing company for the purpose of discovering whether the condition of the Michigan Association was such as to justify further effort to save it. Going into the board as the representative of the Standard Association, it was charged with the knowledge which he could not escape without willfully shutting his eyes; but, irrespective of notice of insolvency, the Standard Association knew that the managers were borrowing money and assigning securities for an illegal purpose. They are therefore in no sense entitled to the footing of an innocent party.

Conceding the utter illegality of the contract, the appellants in the court below and here say that they abandon and repudiate the contract and sue only to recover money which the appellee association received and which ex æquo et bono it ought to retain. The principle to which the appellants appeal is perfectly plain and well settled. Although the managers of the Michigan Association had no power to borrow money for such purposes, yet, to the extent that the money has not been expended or has been paid out in discharge of legitimate obligations of the association, it would be unjust and inequitable that it should not be held accountable. Pullman's Palace Car Co. v. Transportation Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108; Aldrich v. Bank, 176 U. S. 618, 628–636, 20 Sup. Ct. 498, 44 L. Ed. 611; Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238; Logan Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107; In re Cork, etc., Railway Co., L. R. 4 Ch. App. Cas. 748, 760; Travelers' Insurance Co., v. Johnson City, 99 Fed. 663, 666, 40 C. C. A. 58, 49 L. R. A. 123; Perkins v. Boothby, 71 Me. 91, 97; Ditty v. Dominion Bank, 75 Fed. 769, 22 C. C. A. 376; Louisiana City v. Wood, 102 U. S. 294, 26 L. Ed. 153; Hedges v. Dixon County, 150 U. S. 182, 186, 14 Sup. Ct. 71, 37 L. Ed. 1044; In re National Permanent Benefit Building Society, L. R. 5 Ch. App. 309, 313; Cunliffe Brooks Co v. Blackburn Building, etc., Society, L. R. 9 App. Cas. 857; In re Blackburn, etc., Society, L. R. 22 Ch. Div. 61, 71. This right of recovery is based upon an implied promise to return the money or property so received or to make compensation to the extent that it has actually benefited by its application to the discharge of actual liabilities incurred in the legitimate course of business. In Travelers' Insurance Co. v. Mayor, etc., of Johnson City, 99 Fed. 663, 666, 40 C. C. A. 58, 49 L. R. A. 123, this court had occasion to deal with the question as to whether there was any liability in consequence of an issue of railroad bonds by a municipal corporation in aid of a railroad company. The bonds having been held void (Johnson City v. C. C. & C. Railway Co., 100 Tenn. 138, 44 S. W. 670), an action was brought by a holder of bonds against the city for money had and received to its use. Speaking for this court, Taft, Circuit Judge, said:

"Such an action is based, not on an express or implied contract, but upon an obligation which the law supplies from the circumstances, because, ex æquo et bono, the defendant should pay for the benefit which he has derived

at the expense of the plaintiff. It is an obligation which the law supplies, because otherwise, it would result in the unjust enrichment of the defendant at the cost of the plaintiff. It is an obligation which arises only when the defendant has received money or property from the plaintiff and appropriated the same to his own use, either when he might have elected not to take it, or, having the power to do so, might return the benefit thus incurred to the plaintiff, and fails to do so."

In that case the city had received the shares for which the bonds had been issued to the railway company, but, having no power to make the subscription, it had none to receive or hold the share. The construction of a railway station was held not to inure to the benefit of the city because it had been erected on the railway's property and was not the property of the city. No direct benefit having been received, relief was denied. In Parkersburg v. Brown, the holders of the void obligations were permitted to follow the property acquired by their use. In Louisiana City v. Wood, cited above, a recovery was allowed for the money received upon the void obligations; the proceeds having been applied by the city for the very purpose, a lawful one, for which they were issued. In Hedges v. Dixon County, relief was denied. Referring to Read v. Plattsmouth, 107 U. S. 568, 2 Sup. Ct. 208, 27 L. Ed. 414, and Louisiana City v. Wood, cited above, the court said:

"In this case, as in Louisiana City v. Wood, the city got the full pecuniary consideration for the bonds, and applied the money to the very purpose for which they were issued, and upon well-settled principles, if the securities given for the money so obtained proved invalid or defective for any reason, there was a clear legal, as well as moral, obligation to refund the money which had been so advanced to and received by the city. The circumstances and conditions which gave the holders an equitable right in those cases to recover from the municipality the money which the bonds represented do not exist in the case under consideration, where the county received no part of the proceeds of the bonds, and no direct money benefit, but merely derived an incidental advantage arising from the construction of the railroad, upon which advantage it would be impossible for the court to place a pecuniary estimate, or say that it would be equal to such portion of the bonds in question as the county could lawfully have issued."

In re National Benefit Society, 5 Ch. App. 309, 313, was a case in which a building and loan society had borrowed money, having no power to borrow. It was held that the lender had no legal debt and no equitable claim for a recovery. In respect to the claim for equitable relief, Giffard, L. J., said:

"A class of cases has been referred to on that subject, the principal of which are In re German Mining Company (1) and In re Cork and Youghal Railway Company (2), the latter of which was before the Lord Chancellor and myself a short time ago. I have no hesitation in saying that those cases have gone quite far enough. and that I am not disposed to extend them. They were decided upon a principle, recognized in old cases, beginning with Marlow v. Pitfield (3), where there was a loan to an infant, and the money was spent in paying for necessaries, and in another case of a more modern date, where there was money actually lent to a lunatic, and it went in paying expenses which were necessary for the lunatic. In such cases it has been held that, although the parties lending the money could maintain no action, yet, inasmuch as his money had gone to pay debts which would be recoverable at law, he could come into a court of equity and stand in the place of those creditors whose debts had been so paid. That is the principle of those cases. It is a very clear and definite principle, and a principle

which ought not to be departed from. Then it is said that the present case is brought within that principle. I do not think it necessary to go through the evidence. Suffice it to say that there is no proof whatever that one sixpence of this money went in payment of any debt which was recoverable against the company."

In Cunliffe Brooks Co. v. Blackburn Building & Loan Society, cited above, it appeared that the association had no power to borrow, but that it had made large overdrafts at its bankers and had assigned mortgages of borrowing members as security for any balance. It was held that such overdrafts were borrowings and ultra vires, and that the bankers were not creditors and were only entitled to hold the securities as a security for repayment of so much money as should be shown to have been applied to the legitimate debts and liabilities of the association.

The facts that appellants hold certain mortgages made by borrowing shareholders of the Michigan Association as security for the money loaned to the Michigan Association does not materially improve its situation. The managers assigned these securities illegally and appellants are constructively charged with knowledge of their want of power. Their utmost right to hold on to them is to retain them as security for so much of the loan as shall appear to have gone to the benefit of the Michigan Association by discharging legal debts and liabilities which would otherwise be valid claims against that company. This was the rule applied in Blackburn Building & Loan Society v. Cunliffe Brooks Co., L. R. 22 Ch. Div. 61, 71, where it was said by Lord Selborne that "the burden of showing that they are entitled to anything lies upon them (the lender) and not upon the other side." To same effect is In re Permanent Benefit Building Society, L. R. 5 Ch. App. 309, 313. If this money was applied to pay off withdrawing stockholders, the association has not been benefited. To quote from the opinion of Judge Swan upon this point:

"The claim that petitioner can recover for money had and received on the ground that the Michigan Association has had the benefit of the money and ex æquo et bono should repay it cannot be maintained upon these facts. The only persons who received benefits were the withdrawing members of the Michigan who were not entitled to it. Such payments, instead of being beneficial to the association, hastened its failure and diminished its resources by reducing its membership and giving withdrawing members what they had no right to receive when there were no funds in the treasury. This was the first necessary effect of such payments. Its second was the wrong done to the remaining members whose share in its assets is by so much the less because of what was paid to withdrawing members. The third and necessary effect, and that scarcely the less injurious than the first, is that if the claim of petitioner is sustained, and it is given the status of a creditor, the members' rights in the assets of the Michigan Association are subordinated to petitioner, and they can share only in the assets, if any there be remaining after petitioner's claim is paid."

The burden of showing that the association has been benefited by the use of this money, and to what extent, is upon the lending association. The appellants have not met this burden. It is a possible thing that some part of the money loaned went to the payment of legitimate obligations; but, if so, this has not been pointed out in such a definite way as to justify any modification of the decree of the Cir-

cuit Court. The very purpose of the loan was to pay off withdrawing shareholders, and the original agreement that the funds should be paid by the Standard Association direct upon such claims was only abandoned after some claims had been so paid, on account of bookkeeping difficulties. Wemple, the secretary of the Michigan Association, says that the money was all so paid out. The inferences from the book entries found in the evidence of Aldrich that possibly some other obligations were also paid in part from that source are too vague to enable us to say that a single dollar is shown to have been paid upon legitimate debts.

The suggestion that, because moneys paid to withdrawing shareholders may be recovered by the receiver, we should treat the money so supplied as though it had not been dissipated at all, would be to throw the whole chance of loss upon shareholders who did not withdraw and are not responsible for the precarious condition of the association or of the claim which the appellants assert. The burden was upon complainant to show to what extent the money borrowed had benefited the lending association. It has not shown that any part of the money paid out to withdrawing shareholders has or can be collected.

This is fatal to any relief, and the decree of the court below must be affirmed, with costs.