## BARRON v. McKINNON.

(Circuit Court of Appeals, First Circuit. May 22, 1912.)

### No. 936.

1. BANKS AND BANKING (§ 260*)—NATIONAL BANKS—PURCHASE OF STOCK.

Under Rev. St. § 5136 (U. S. Comp. St. 1901, p. 3455), defining the general powers of national banks, and conferring no express power to deal in stocks of corporations, a purchase of stock in a corporation by a national bank from one of its officers for the purpose of selling the same at a profit was ultra vires and voidable as between the parties.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 977–978, 983, 984, 986½–990; Dec. Dig. § 260.*]

2. BANKS AND BANKING (§ 261*)—NATIONAL BANKS—ULTRA VIRES ACT—PURCHASE OF STOCK—TITLE.

Though a purchase of corporate stock by a national bank from one of its officers was ultra vires and voidable as between the parties, it was not void, and title passed to the bank which it could transfer to a third person prior to any election by the other party to the original transaction to rescind the sale.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 991–1000; Dec. Dig. § 261.*]

3. CORPORATIONS (§ 487*)—POWERS—ULTRA VIRES ACT.

The doctrine of ultra vires rests on the principle that on grounds of public policy courts will not enforce an illegal or ultra vires contract, and that a defendant may avail himself of the defense in a suit brought to enforce such contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1893–1898; Dec. Dig. § 487.*]

4. BANKS AND BANKING (§ 261*)—NATIONAL BANKS—PURCHASE OF REAL ESTATE.

A purchase of real estate by a national bank for a purpose other than that specified by Rev. St. § 5137 (U. S. Comp. St. 1901, p. 3460), is voidable only and not void.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 991–1000; Dec. Dig. § 261.*]

5. BANKS AND BANKING (§ 261*)—NATIONAL BANKS—LOANS—COLLATERAL—OWN STOCK—TRANSFER.

Though a national bank has no power to loan money on its own stock as collateral in violation of Rev. St. § 5201 (U. S. Comp. St. 1901, p. 3494), a loan made in violation of such section is voidable only, and hence the bank, having been compelled to take title to its stock so held as collateral, may convey a good title to a purchaser.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 991–1000; Dec. Dig. § 261.*]

6. CORPORATIONS (§ 487*)—ULTRA VIRES—STATU QUO.

Where a defense of ultra vires is available on the ground of public policy, the court will strive to do justice between the parties, either by refusing to interfere in rare cases, or by permitting the money or property parted with on the faith of the unlawful contract to be recovered or compensation made therefor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1893–1898; Dec. Dig. § 487.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the Circuit Court of the United States for the District of Massachusetts.

Suit by the receiver of the National Bank of North America, continued in the name of John W. McKinnon, shareholders' agent, against Clarence W. Barron. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 179 Fed. 759.

Sherman L. Whipple, of Boston, Mass. (Alexander Lincoln and Whipple, Sears & Ogden, on the brief), for plaintiff in error.

Walter I. Badger, of Boston, Mass. (William Harold Hitchcock, on the brief), for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

COLT, Circuit Judge. This suit was brought by the receiver of the National Bank of North America to recover the balance due upon a promissory note for $70,000 signed by the defendant, Clarence W. Barron, and indorsed by him to the bank. Subsequently, upon the appointment of John W. McKinnon as shareholders' agent, he was substituted for the receiver as the plaintiff in the suit.

At the close of the evidence, the court below directed a verdict for the plaintiff in the sum of $54,852.12. To this ruling, and to other rulings admitting and excluding certain evidence, the defendant duly excepted, and the case is now before this court on writ of error.

The important question in the case is whether the Circuit Court was justified, upon the evidence, in directing a verdict for the plaintiff.

The facts, so far as they are deemed material, may be summarized as follows:

On October 25, 1906, Charles W. Morse, then vice president of the National Bank of North America, sold to the bank 8,000 shares of stock of the Mallory Steamship Company. On October 26th, the day following, this stock was delivered to the bank by Morse. On the same day, Morse received in payment for this stock a cashier's check for $200,000, which was at the rate of $25 per share.

On November 20, 1906, Morse, acting for the bank, sold to the defendant 2,000 shares of this Mallory stock at the rate of $35 per share, and on the same day the defendant paid for this stock by delivering to the bank his note for $70,000; the bank retaining the stock as collateral security for the note. It was understood at the time that other stock might be substituted as collateral for this Mallory stock, and subsequently this was done.

With respect to this transaction, the cashier of the bank, Mr. Wire, testified that when the bank bought the stock of Mr. Morse it charged up the price it paid in the bond and stock account, and when this transaction went through it was transferred to the loan department; that the stock was carried into the collateral account by crediting the bond and stock account $50,000 and the commission account, which was a subdivision of the profit and loss account, $20,000; that on the collateral account there stood 2,000 shares at 35 and the note for $70,000; that standing on the books of the bank the transaction rep-

resented the purchase of these shares of stock from Mr. Morse at 25, the sale of them to the defendant at a profit of $20,000, paying cash to Mr. Morse, and taking the defendant's note and continuing to hold the stock as collateral, then the substitution of bonds of the new company for the stock of the old as collateral, and the sale of those bonds from time to time, crediting it on the note; and that that was substantially all the books show.

The witness further testified that he understood that Mr. Morse was then engaged in attempting a consolidation that was to come about of a lot of coastwise steamship lines; that he made those purchases of stock and received subscriptions and organized the company in pursuance of that purpose. He further testified that while a vice president, director, and large stockholder of this bank, Morse turned over these 8,000 shares to the bank and received a check for $200,-000, and that thereafter the bank sold the whole 8,000 shares (some of it at 35 and some of it at 40); that the quotations on the market for those shares on the 20th of November, 1906, were between 33 and 34.

The witness further testified that at some time during the year the bank gave up the Mallory stock and received in place thereof bonds to the face value of $200,000 and 2,000 shares of stock in the Consolidated Company; that the bank still had the shares of stock; that after the bonds were delivered to the bank the first coupon, amounting to $4,000, was paid to the bank, and no other coupon was paid; that after the maturity of the note the bonds were sold by the receiver from time to time, and the amount of the proceeds was indorsed on the note; that the 2,000 shares of stock are still in Mr. McKinnon's possession.

Walter W. Lee, a vice president of the bank, testified, among other things, as follows:

"Q. Mr. Lee. I call your attention to these three papers pinned together. I call your attention in the first place to a certificate of stock of the Mallory Steamship Company and ask if you ever saw it before? A. I have. I have seen it, yes.

"Q. Where did you see it? A. The first time was November 20th, the day it was issued.

"Q. Did you at any time see this assignment which I have just read to the jury, signed by Mr. Barron? A. I have seen it; yes, sir.

"Q. Where did you first see that? A. The day I received this certificate to put in the bank's vaults.

"Q. That is November 20th? A. November 20th.

"Q. 1906? A. Yes, sir.

"Q. What was done with it between the time that you received it and the time it was sent on for transfer? A. It was deposited in one of the safe deposit boxes of the National Bank of North America.

"Q. Did you hold it or not? A. I did."

The certificate of stock here referred to was a certificate of 2,000 shares of the Mallory Steamship Company issued to C. W. Morse; and on the back of the certificate was an indorsement transferring this stock to C. W. Barron. The assignment here referred to was an assignment by C. W. Barron of this Mallory stock to the Consolidated Steamship Company.

. Lee further testified that subsequently the certificate and assignment were sent away by some officer of the bank, and that he thereafter received in place of it $200,000 bonds of the Consolidated Steamship Lines Company and a certificate for 2,000 shares in that company.

The witness further testified to the following entry in the memorandum book kept by him as trustee:

"C. W. Barron, November 20, 1906, 2,000 shares of Mallory exchanged for 2,000 Consolidated Steamship stock and 200 M Consolidated Steamship bonds.
"E. B. W.    W. W. L."

It also appeared in evidence as a part of this transaction that Lee received from Barron the following trust receipt:

"Trust Receipt.                                         November 20, 1906.

"Received from C. W. Barron, the following property to be held by Walter W. Lee, as trustee, as collateral security—2.000 shares of capital stock of the Mallory Steamship Company; and in consideration thereof, said trustee hereby agrees to hold said property in trust for the purpose of securing a certain note, endorsed by C. W. Barron to the National Bank of North America in New York, of C. W. Barron dated November 20, 1906 and due November 20, 1907, for $70,000.00 and interest. at 6 per cent.

"The intention of this arrangement is to protect and preserve unimpaired a possession and lien of the National Bank of North America in New York of and on said property.                              By W. W. Lee, Trustee."

It further appeared in evidence that on November 20, 1906, Morse gave to Barron the following paper:

"New York, November 20, 1906.
"C. W. Barron, Exchange Place, Boston, Mass.

"Dear Sir: I hereby agree that in case you so decide, I will take from you on November 19, 1907, two thousand (2,000) shares of Mallory Steamship Company's stock at what it cost you to-day, $35.00 per share and interest, less any dividends you have received."

The defense to this suit is that this entire transaction was ultra vires and wholly void. In support of this position the defendant relies on the following propositions:

(1) The purchase of stock by a national bank is ultra vires.

(2) The sale of stock by a national bank as a part of a speculative venture is equally ultra vires.

(3) This action, being upon alleged sale of stock to the defendant, cannot be maintained, because the sale was ultra vires.

(4) Assuming that the alleged sale of stock to the defendant was not ultra vires, the bank had no title to the stock which it could convey to the defendant, and therefore there was an entire failure of consideration for the note.

In considering the question of ultra vires which is raised by these propositions, it is apparent that the facts in this case disclose not a single transaction, but two transactions or contracts which are entirely separate and distinct, and which may be stated as follows:

First. The purchase by the bank from Morse on October 25, 1906, of 8,000 shares of the stock of the Mallory Steamship Company, for which the bank paid on the day following $200,000.

. Second. The subsequent sale by the bank on November 20, 1906, of 2,000 shares of this stock to the defendant, for which the defend-

ant gave a note for $70,000; the bank retaining the stock as collateral security for the note.

Concerning the second transaction, it is manifest that there was nothing illegal or ultra vires in the sale by the bank of 2,000 shares of this stock to the defendant and in the bank taking the stock as security for the defendant's note. On the contrary, it may be said that, after the bank had purchased the 8,000 shares of this stock from Morse, it was its duty to dispose of it at once, and thus restore to the bank the $200,000 which it paid for the stock; and if the Comptroller had been informed that the bank had purchased this stock, he would doubtless have directed that the stock be immediately sold. Concord National Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007. See, also, sections 5137 and 5201 of Rev. Stat.

[1] Concerning the first transaction, it is equally clear that the purchase by the bank of this stock from Morse was ultra vires. National banks are not organized for the purpose of trading or speculating in stocks, and while this power is not expressly prohibited, such a prohibition is implied by the failure to grant the power. Rev. Stat. § 5136; First National Bank v. National Exchange Bank, 92 U. S. 122, 23 L. Ed. 679; California Bank v. Kennedy, 167 U. S. 362, 367, 369, 17 Sup. Ct. 831, 42 L. Ed. 198; First National Bank v. Hawkins, 174 U. S. 364, 367, 19 Sup. Ct. 739, 43 L. Ed. 1007; First National Bank v. Converse, 200 U. S. 425, 439, 26 Sup. Ct. 306, 50 L. Ed. 537; Central Transportation Co. v. Pullman Car Co., 139 U. S. 24, 48, 11 Sup. Ct. 478, 35 L. Ed. 55; McCormick v. Market Bank, 165 U. S. 538, 549, 17 Sup. Ct. 433, 41 L. Ed. 817.

[2] The main contention of the defendant is that, under the foregoing decisions of the Supreme Court, the bank had no title to this stock which it could convey to the defendant, and therefore that there was an entire failure of consideration for the note upon which the present suit is brought. In a word, the defendant's position is that the title to this stock is still in Morse. Before considering this proposition, it may be well to state the effect of its application to the facts in this case.

Assuming that the title to this stock is still in Morse, the defendant says that it is the duty of the bank to proceed to recover back the money paid to Morse upon returning to him the stock. But, assuming that Morse has $200,000 to pay back to the bank, it is impossible for the bank to return this stock to Morse. It appears from the evidence that the defendant has transferred his 2,000 shares to the Consolidated Steamship Company; it also appears from the evidence that the remaining 6,000 shares were sold by the bank to sundry purchasers; and it would not be an unusual circumstance if in the past five years the whole 8,000 shares had been resold and retransferred a number of times.

It is apparent that the question in this case is essentially one of title, and not of the enforcement of a contract.

The contract of October 25, 1906, by which the bank purchased 8,000 shares of Mallory Steamship stock, and which became fully executed the following day by the payment to Morse of $200,000, still

remains in force. In other words, it has never been repudiated by either of the parties to the contract. This suit is not brought to enforce this contract; in such a suit the defense of ultra vires might be set up by either party to the contract.

The contract of November 20, 1906, by which the bank sold 2,000 shares of this stock to the defendant, taking his note for $70,000, is a legal contract, and the only defense to the present suit upon the defendant's note is that the bank had no title to this stock, and hence could not convey a good title to the defendant; in other words, that the title to this stock is still in Morse.

This case therefore presents the question whether on October 26, 1906, when the bank completed the purchase of this stock, the title passed to the bank or still remained in Morse; or, to state the question in another way, whether the bank, having purchased this stock under an ultra vires contract, could convey a good title to the defendant before the repudiation of the contract by either party, or while it was treated by both parties as a valid and existing contract.

The question whether the title to stock was in the bank or in Morse, under ultra vires transactions similar to the one involved in the present suit, has been before the Circuit Court of Appeals for the Second Circuit in two cases, and in both cases the court held that the title to the stock was in the bank. Metropolitan Trust Co. v. McKinnon, 172 Fed. 846, 849, 850, 97 C. C. A. 194; Morse v. United States, 174 Fed. 539, 544, 545, 546, 547, 551, 98 C. C. A. 321, 20 Ann. Cas. 938.

[3] We understand that the doctrine of ultra vires rests upon the principle that on grounds of public policy the courts will not enforce an illegal or an ultra vires contract, and that a defendant may avail himself of this defense in a suit brought to enforce the contract. We do not understand that the title to property does not pass to the vendee under an executed contract of sale which is ultra vires. On the contrary, we understand the rule to be that the title does pass, and that it remains in the vendee until the contract has been repudiated, and that upon such repudiation the vendee must account to the vendor for the property, or, if the property has been disposed of, for its value.

An instructive and leading case on this subject is Pullman's Car Co. v. Central Transportation Co., 171 U. S. 138, 159, 18 Sup. Ct. 808, 43 L. Ed. 108. In that case, we have an instance of an executed ultra vires contract under which the parties had acted for 15 years. The subject-matter of the contract was a lease, and the court considered the acts of the lessee under the lease as lawful until the repudiation of the contract. The rule was there laid down that after such repudiation the lessee, upon the ground of an implied contract, must either return the property or make compensation for it. In that case no property was returned, and the lessee was held to account for the value of the property, not at the time the lease was executed, but at the time the contract was repudiated, 15 years later. That case recognized the right of the lessee to exercise in the use and disposition of the property covered by the lease all the powers conferred by the lease down to the time of its repudiation by the lessee.

The decisions of the Supreme Court under the national banking

law which have a bearing on the case at bar arrange themselves under three heads:

(1) Those arising under section 5137 of Rev. Stat.
(2) Those arising under section 5201 of Rev. Stat.
(3) Those arising under section 5136 of Rev. Stat.

[4] Section 5137 provides that:

"A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others."

The purchase, holding, and conveyance of real estate by national banks is here prohibited except for the purposes enumerated in this section. With respect to this section the Supreme Court has held in several cases that a conveyance of real estate to a national bank in violation of the prohibition contained in this section is not void, but only voidable. The latest decision of the court on this point is found in Kerfoot v. Farmers' & Merchants' Bank, 218 U. S. 281, 286, 31 Sup. Ct. 14, 54 L. Ed. 1042. In that case Mr. Justice Hughes, speaking for the court, says:

"In the absence of a clear expression of legislative intention to the contrary, a conveyance of real estate to a corporation for a purpose not authorized by its charter is not void, but voidable, and the sovereign alone can object. Neither the grantor nor his heirs nor third persons can impugn it upon the ground that the grantee has exceeded its powers. Smith v. Sheeley, 12 Wall. 358 [20 L. Ed. 430]; National Bank v. Matthews, 98 U. S. 621 [25 L. Ed. 188]; National Bank v. Whitney, 103 U. S. 99 [26 L. Ed. 443]; Reynolds v. Crawfordsville Bank, 112 U. S. 405 [5 Sup. Ct. 213, 28 L. Ed. 733]; Fritts v. Palmer, 132 U. S. 282 [10 Sup. Ct. 93, 33 L. Ed. 317]; Leazure v. Hillegas. 7 Serg. & R. (Pa.) 313. Thus, although the statute by clear implication forbids a national bank from making a loan upon real estate, the security is not void, and it cannot be successfully assailed by the debtor or by subsequent mortgagees because the bank was without authority to take it; and the disregard of the provisions of the act of Congress upon that subject only lays the bank open to proceedings by the government for exercising powers not conferred by law. National Bank v. Matthews, supra; National Bank v. Whitney, supra; Swope v. Leffingwell. 105 U. S. 3 [26 L. Ed. 939]."

The opinion then cites at length from the leading case of National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188, where this subject is fully discussed.

[5] Section 5201 provides that:

"No association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith."

Several cases have arisen under this section where national banks have loaned money on their own shares of stock or purchased such shares, in violation of this section of the statute. In these cases the court has held, as in the cases relating to real estate, that the bank's title to stock, obtained under these ultra vires transactions, is not void, but only voidable, and hence that the bank can convey a good title to a purchaser. National Bank of Zenia v. Stewart, 107 U. S. 676, 677, 2 Sup. Ct. 778, 27 L. Ed. 592; Lantry v. Wallace, 182 U. S. 536, 551, 552, 553, 21 Sup. Ct. 878, 45 L. Ed. 1218.

In National Bank of Zenia v. Stewart, the bank took as security for money loaned to A. shares of its own stock which it subsequently sold. In the opinion in that case the court said:

"While this section [5201] in terms prohibits a banking association from making a loan upon the security of shares of its own stock, it imposes no penalty, either upon the bank or borrower, if a loan upon such security be made. If therefore the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank. It can then, if at all, be invoked to restrain or defeat the enforcement of the security. When the contract has been executed, the security sold, and the proceeds applied to the payment of the debt, the courts will not interfere with the matter. Both bank and borrower are in such case equally the subjects of legal censure, and they will be left by the courts where they have placed themselves."

In Lantry v. Wallace, a national bank purchased some of its own stock which it subsequently sold to the defendant. In a suit brought by the receiver to enforce the stockholder's liability under section 5151 (U. S. Comp. St. 1901, p. 3465), the defendant contended that the purchase by the bank of its own stock was not "simply voidable, but was absolutely void," and consequently that the sale to him of such stock was void, and hence that he did not become a stockholder within the meaning of section 5151. In the opinion in that case, after referring to the decisions in National Bank of Zenia v. Stewart, supra, and Scott v. Deweese, 181 U. S. 202, 21 Sup. Ct. 585, 45 L. Ed. 822, the court said:

"In view of these decisions, it cannot be held that the purchase by the bank of its own shares of stock was void. It was of course a matter of which the government by its officers could take cognizance; and it may be that it was a matter of which stockholders, having an interest in the proper administration of the affairs of the bank, could complain in a proceeding instituted by them to restrain the bank from violating the statute. But, when the violation of the statute has occurred, it is not a matter of which a shareholder can complain in order that he may be relieved from the liability attaching to him as a shareholder and which the receiver seeks to enforce under the orders of the Comptroller. In the present case, Judge Thayer, delivering the opinion of the Circuit Court of Appeals, well said: 'In considering the second defense which was interposed by the defendant, it is important to bear in mind that the 200 shares of shock which he purchased from the bank was not void stock, but was stock which, according to the averments of the answer, had once been issued to other persons and had been reacquired by the bank by purchasing it from such other persons to prevent them from throwing it on the market at ruinous prices. It is necessary to infer from the averments of the answer that this stock had once passed the scrutiny of the Comptroller, and had been outstanding and had been held by other persons since the organization of the bank in the year 1891. The purchase of this stock by the bank under the circumstances disclosed by the answer was doubtless ultra vires, but the purchase in question did not render the stock void. In purchasing it the bank made an unlawful use of its funds, for which the officers concerned in the transaction could have been held responsible, as for any other unlawful act, if the corporation had sustained damage; but in point of fact, by the sale of the stock to the defendant that portion of its capital which had been dissipated by the purchase was restored by the resale, and no loss seems to have been incurred. We are at a loss to understand how this transaction on the part of the bank can operate to relieve the defendant from his liability as a stockholder in a suit brought by the receiver to recover a stock assessment which was levied solely for the benefit of corporate creditors. The sale of the stock to the defendant after the bank

had purchased the same was not unlawful, since it operated to restore that part of the capital that had been retired, and to that extent repaired the wrong which might otherwise have been done to the bank's creditors.' "

Section 5136 defines the general powers of national banks in carrying on the business of banking. No express power to deal in stocks is conferred by this section, and it has been uniformly held by the Supreme Court, beginning with the case of First National Bank v. National Exchange Bank, 92 U. S. 122, 128, 23 L. Ed. 679, that a prohibition to deal in stocks is to be implied from the failure to grant the power. It is also settled that the statutes of the United States constitute the measure of the authority of such corporations, and that they cannot rightfully exercise any powers except those expressly granted, or which are incidental thereto. California Bank v. Kennedy, 167 U. S. 362, 366, 17 Sup. Ct. 831, 42 L. Ed. 198.

The cases arising under this section, upon which the defendant relies, are cases in which a national bank had acquired stock of another corporation, and in which it was sought to enforce its liability as a stockholder in a suit by the receiver of such corporation. The first and leading case is California Bank v. Kennedy, supra. In the opinion in that case the court, at page 366 of 167 U. S., at page 833 of 17 Sup. Ct. (42 L. Ed. 198), states the question in issue as follows:

" 'The California National Bank, one of the defendants, has appealed upon the ground that, by virtue of the statutes under which it is organized, it had no power to become a stockholder in another corporation, and that its act in becoming such stockholder is so far ultra vires that it cannot be made liable for any portion of the indebtedness of the corporation.' "

The opinion proceeds:

"No express power to acquire the stock of another corporation is conferred upon a national bank, but it has been held that, as incidental to the power to loan money on personal security, a bank may in the usual course of doing such business accept stock of another corporation as collateral, and by the enforcement of its rights as pledgee it may become the owner of the collateral and be subject to liability as other stockholders. National Bank v. Case, 99 U. S. 628 [25 L. Ed. 448]. So, also, a national bank may be conceded to possess the incidental power of accepting in good faith stock of another corporation as security for a previous indebtedness. It is clear, however, that a national bank does not possess the power to deal in stocks. The prohibition is implied from the failure to grant the power. First National Bank v. National Exchange Bank, 92 U. S. 122, 128 [23 L. Ed. 679].

*     *     *     *     *     *     *     *     *

"Whatever divergence of opinion may arise on this question from conflicting adjudications in some of the state courts, in this court it is settled in favor of the right of the corporation to plead its want of power; that is to say, to assert the nullity of an act which is an ultra vires act."

After citing authorities, the opinion proceeds:

"Applying the principles of law thus settled to the case at bar, the result is free from doubt.

"The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred. A dealing in stocks is consequently an ultra vires act. Being such, it is without efficacy. Pearce v. Railroad Company, 21 How. 441, 445 [16 L. Ed. 184]. Stock so acquired creates no liability to the creditors of the corporation whose stock was attempted to be transferred."

A similar question was before the court in Concord National Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007, and First National Bank of Ottawa v. Converse, 200 U. S. 425, 26 Sup. Ct. 306, 50 L. Ed. 537, and the doctrine laid down in California Bank v. Kennedy was affirmed.

These cases establish two propositions: First, that a national bank does not possess the power to deal in stocks; and, second, the right of the bank to plead its want of power—in other words, to assert the nullity of the ultra vires act, in a suit brought by a receiver to enforce the bank's liability as a stockholder.

In these cases the conclusions of the court, as appears from the opinions, were based largely upon its decisions in McCormick v. Market Bank, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817, and Central Transportation Co. v. Pullman Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55.

McCormick v. Market Bank was an action upon a lease. The bank in that case had executed a lease before it had been authorized by the Comptroller to commence the business of banking. The court held that the bank was without power to make the lease and that it was ultra vires and void. In the opinion, at pages 549, 550, and 553 of 165 U. S., at pages 436 and 438 of 17 Sup. Ct. (41 L. Ed. 817), the court says:

"The lease sued on, therefore, was clearly prohibited by the very terms of the statute from which the association assumed to derive its power to execute the lease.

"The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation, to take notice of the legal limits of its powers; the interest of the stockholders, not to be subject to risks which they have never undertaken; and, above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law. * * *

"The present case is not one of irregularity of organization, or of abuse of a legal power, but of an attempt to exercise a power expressly prohibited by statute.

"The lease sued on having been executed by the defendant, contrary to the express prohibition of the statute, which peremptorily forbade the corporation to transact any business, unless to perfect its organization, and thus denied it the capacity of entering into any contract whatever, except in perfecting its organization, the lease is void, cannot be made good by estoppel, and will not support an action to recover anything beyond the value of what the defendant has actually received and enjoyed. Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 54–61 [11 Sup. Ct. 478, 35 L. Ed. 55]; Logan County Bank v. Townsend, 139 U. S. 67 [11 Sup. Ct. 496, 35 L. Ed. 107]."

It will be noted in that case that the court recognized the legality of the action of the parties under the lease until it was repudiated.

Central Transportation Company v. Pullman Car Co., supra, is an important case on the question of ultra vires. That case, as we have already stated, related to an ultra vires lease between two transportation companies which had been in force between the parties for 15 years. The case was twice before the Supreme Court. The first decision is found in 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, and the second in 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108.

The first case was an action for rent in which the defendant set up as a defense the want of corporate power "on the part of the parties thereto to make and enter into said indenture of lease." The court sustained this defense, holding that the lease was ultra vires and void. In the course of the opinion, at pages 59, 60, and 61 of 139 U. S., at page 488 of 11 Sup. Ct. (35 L. Ed. 55), the court said:

"A contract of a corporation, which is ultra vires, in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. * * *

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

"In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.

"The ground and the limits of the rule concerning the remedy, in the case of a contract ultra vires, which has been partly performed, and under which property has passed, can hardly be summed up better than they were by Mr. Justice Miller in a passage already quoted, where he said that the rule 'stands upon the broad ground that the contract itself is void, and that nothing which has been done under it, nor the action of the court, can infuse any vitality into it'; and that 'where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands.' Pennsylvania Railroad v. St. Louis, etc., Railroad, 118 U. S. 317 [6 Sup. Ct. 1094, 30 L. Ed. 83]."

In 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108, the case was before the court on the question of an accounting between the parties during the 15 years the lease had been in force, or down to the time of its repudiation by the lessee.

In the course of the opinion, at pages 150 and 151 of 171 U. S., at page 813 of 18 Sup. Ct. (43 L. Ed. 108), the court said:

"It was said (page 60 of the report in 139 U. S. [page 488 of 11 Sup. Ct., 35 L. Ed. 55]), 'the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties so far as could be done consistently with adherence to law by permitting property or money parted with on the faith of the unlawful contract to be recovered back or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract nor according to its terms, but on an *implied contract* of the defendant to return, or failing to do that, to make compensation for the property or money which it had no right to retain. To maintain such an action was not to affirm, but to disaffirm, the unlawful contract.' * * *

"The principle is not new; but, on the contrary, it has been frequently announced, commencing in cases considerably over a hundred years old. It was said by Lord Mansfield, in Holman v. Johnson, 1 Cowper, 341, decided in 1775, that 'the objection that a contract is immoral or illegal as between the

plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: Ex dolo malo non oritur actio. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act.'

"The cases upholding this doctrine are numerous and emphatic. Indeed, there is really no dispute concerning it, but the matter of controversy in this case is as to the extent to which the doctrine should be applied to the facts herein."

In applying the doctrine of ultra vires to the facts of that case, the court in the opinion, at pages 159 and 160 of 171 U. S., at page 817 of 18 Sup. Ct. (43 L. Ed. 108), lays down the following rule:

"The property was placed in its hands by the lessor and in accordance with the terms of the agreement. It was not then impressed with any trust according to any definition of that term known to us. Although the title did not pass and was not intended to pass, the lessee did nothing with the property other than was justified by the lease. His liability is based only upon an implied promise to return or make compensation therefor. This implication of a promise would not arise until one or the other party chose to terminate the lease, for the law implies such promise in order only that justice, so far as is possible, may be done. So long as neither party takes any objection to the agreement, and both carry it out, there is no room for any differences, and no promise to return the property or make compensation is necessary, and none is therefore implied. The use of the property is lawful as between the parties, so long as the lease was not repudiated by either, and the rent compensates for the use. After the repudiation the promise is then implied, and it is fulfilled by the payment of the value of the property at the time the promise is implied and interest thereon from that time."

In that case the subject-matter of the lease was cars, contracts, and patents. The contracts and patents having expired during the 15 years the lease was in force, the court held that the rent paid by the lessee was a sufficient compensation. With respect to the cars, the court ruled that, as they had been mingled with the lessee's business, they could not be returned, and hence that the lessee should account for their value at the time of the revocation of the lease.

That case is clearly an authority for the proposition that the acts of the parties in the case of an executed ultra vires contract which are within the powers and rights conferred by the contract are lawful until the contract is repudiated, when the party who received property under the contract must return either the property or its value at the time of the repudiation, on the ground of an implied contract.

[6] Stated in another way, an ultra vires contract is a defense which, on grounds of public policy, a party to the contract may avail himself of. When so set up as a defense, the court will strive to do justice between the parties. This may be done either by refusing to interfere in some rare cases, or by permitting the money or property parted with on the faith of the unlawful contract to be recovered back or compensation made for it.

The whole doctrine of ultra vires is based upon the principle that the court will not aid in the enforcement of an illegal act. At the same time, in the case of an executed ultra vires contract the court

will treat the disposition of the property received under the contract as lawful until it is repudiated.

Applying these principles to the case at bar, the bank manifestly acquired a good title to this stock and could convey a good title to the defendant. The bank possessed all the powers over this stock conferred by its contract of purchase until the repudiation of the contract. If the terms of the contract had been such that Morse could have brought suit for the purchase price, and the bank had set up the defense of ultra vires, then the bank, on the doctrine of an implied contract, would have been obliged to return to Morse the stock which it still held or the value of the stock which it had sold.

In no case which has been brought to our attention has the court in the case of an executed ultra vires contract relating to the sale of property ever questioned the right of the party to whom the property was conveyed to dispose of it, while both parties were acting under the contract, or questioned the title of a third party to whom the property was so conveyed. On the contrary, as we have seen, the courts recognize the acts of parties under an executed ultra vires contract as legal until its repudiation. In other words, a vendee of property acquired under such a contract can convey a good title to a third party at any time during the existence of the contract or until it has been repudiated.

With respect to the other exceptions which relate to the admission and exclusion of evidence we find no error in the rulings of the court below.

The judgment of the Circuit Court is affirmed, and the appellee recovers costs of appeal.