## McCANDLESS v. HASKINS et al.

District Court, D. South Dakota. June, 1927.

1. **Banks and banking** ⬠248(1)—Real owner of national bank stock may be treated as "shareholder," within meaning of law authorizing assessments (Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 [Comp. St. § 9689]).

Real owner of shares of capital stock of national banking association may in every case be treated as "shareholder," within meaning of Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 (Comp. St. § 9689), authorizing 100 per cent. assessment against shareholder.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Shareholder.]

2. **Banks and banking** ⬠248(1)—Person allowing himself to appear as registered owner of national bank shares may be treated as "shareholder," within law authorizing assessment (Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 [Comp. St. § 9689]).

Any person who holds himself out as owner of shares of national bank by allowing himself to appear as registered owner thereof on books of banking association may be treated as a "shareholder," within meaning of Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 (Comp. St. § 9689), authorizing assessment.

3. **Banks and banking** ⬠249(1)—Real owner transferring national bank shares to another person to evade responsibilities may be treated as "shareholder" and liable for assessment (Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 [Comp. St. § 9689]).

If real owner of national bank shares transfers them to another person, or causes them to be placed on books of banking association in name of another person, with intent to evade responsibilities imposed by Rev. St § 5151, as amended by Act Dec. 23, 1913, § 23 (Comp. St. § 9689), such person may be treated for purpose of that section as a "shareholder" and liable for assessment therein prescribed.

4. **Banks and banking** ⬠248(4)—Person receiving national bank shares as collateral held not "shareholder," within law authorizing assessments (Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 [Comp. St. § 9689]).

Person, receiving shares of stock of national banking association as collateral security for a debt due from owner in good faith and for purpose only of securing payment of that debt without incurring responsibility of shareholder, will not be treated as "shareholder," within meaning of Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 (Comp. St. § 9689), authorizing assessments.

5. **Banks and banking** ⬠248(4)—Directors taking into bank cashier's stock in exchange for notes, on his removal and advancing money to bank with stock as security, held not liable for assessments (Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 [Comp. St. § 9689]).

Bank directors, taking into bank stock of cashier in exchange for certain notes after demand of bank examiner that cashier be removed, and on failure to dispose of stock as planned

to new cashier, advancing money with agreement that stock should be held as security for sum advanced, *held* not liable as shareholders for assessment under Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 (Comp. St. § 9689).

6. **Banks and banking** ☞261(1)—**Bank's purchase of cashier's stock on removal held not void, and not to vest title in directors or subject them to assessment (Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 [Comp. St. § 9689]).**

Bank's purchase of cashier's stock on his removal giving him in exchange therefor certain notes, though ultra vires, *held* not void, so as to automatically vest title thereto in directors, within meaning of Rev. St. § 5151, as amended by Act Dec. 23, 1913, § 23 (Comp. St. § 9689), authorizing assessment against shareholders.

In Equity. Action by R. B. McCandless, as receiver of the First National Bank of Oldham, S. D., against Hugh L. Haskins, as administrator of the estate of Harlow L. Haskins, deceased, and others. Judgment of dismissal.

Bailey & Voorhees and Harry C. Eggen, all of Sioux Falls, S. D., for plaintiff.

Boyce, Warren & Fairbank and Parliman & Parliman, all of Sioux Falls, S. D., and Gardner & Churchill, of Huron, S. D., for defendants.

ELLIOTT, District Judge. I have reviewed and re-reviewed the issues of fact and law presented in Re McCandless, Receiver of the First National Bank of Oldham, S. D., v. Hugh L. Haskins, as Administrator of the Estate of Harlow L. Haskins, et al. Upon the questions of fact presented I am now confirmed in my judgment indicated at the close of the taking of testimony. The facts in this case make it one considerably out of the ordinary. The defendants, themselves, farmers, who, if either of them possessed a single qualification of a banker, either in learning or experience, concealed it completely when they appeared as witnesses. How they came to have anything to do with the bank in question does not appear, except inferentially from the testimony of Jans, the cashier, who held the stock in question. Their ignorance and inexperience is emphasized by everything that they did in connection with the bank in question.

In the spring of 1922 Jans was the owner of 75 shares of stock in the First National Bank of Oldham of the par value of $100 per share, and the defendants were directors of the bank. The national bank examiner, who was not only the determining factor but the guiding spirit in the transaction in question,

had become aware of the failing condition of the bank. There were some $6,000 in what were referred to as "exchange notes"; that is, transactions where this bank and two other friendly banks had exchanged bills receivable with the idea of bolstering up all three of the banks with the paper of each other for the purpose of taking out assets that had been questioned by the bank examiners, and thus enabling the banks respectively to, in this questionable way, comply with the demands of the bank examiners. Jans, the cashier of the First National Bank of Oldham, had extended large credits to himself and to his wife, and excessive credits to others who were not financially responsible, and the bank examiner was demanding that the cashier be discharged and another more responsible person be put in his place. This same demand was being voiced by the governor of the Federal Reserve Bank of Minneapolis, with whom the Oldham bank was doing business.

This being the situation, and on account of these demands of the bank examiner, it is very clear that the directors of the bank proceeded in their way, under the direction of the bank examiner, to make effective these demands. The minutes of the meetings of the directors of the First National Bank of Oldham show action taken with reference to the removal of the said cashier, as follows:

May 5, 1922: "Moved and seconded that the resignation of H. G. Jans as cashier be accepted."

June 6, 1922: "Motion made that the minutes of previous meeting be approved except that they be corrected as follows: 'Amendment. That H. G. Jans' resignation be asked for and accepted.' Carried."

July 5, 1922: "Discussion was then had as to electing a cashier. Board received a visit from A. N. Johnson, and also a proposition to purchase $7,500 stock, book value, same to carry cashiership. On motion, matter was laid over for further discussion."

July 14, 1922: "Discussion of matter of taking over Jans' stock was then had. It was agreed by directors present that stock of H. G. Jans be taken over in trust for benefit of condition of the bank and matter was continued until return of Mr. Jans."

August 2, 1922: "Stockbook was gone over by board members. No change from last inspection, except five shares of H. G. Jans' stock transferred to Geo. Hook; 5 shares of H. G. Jans' stock transferred to Jens Thompson."

August 2, 1922: "The matter of taking over Jans' stock was then discussed. Jans at

previous time having offered to turn in stock to the bank for sale and take out poor and excessive paper, but upon request of the board that he do so he refused and failed to attend the meeting of the board to take care of the matter."

August 8, 1922: "Motion made by H. L. Haskins, seconded by Thomas Duffy, that contract between bank and A. N. Johnson be accepted. Motion carried, and that A. N. Johnson be elected cashier at salary of $200 per month, and authorized to sign for the bank. Motion carried."

August 28, 1922: "That the undersigned board of directors of the First National Bank of Oldham have received from H. G. Jans 75 shares of the capital stock of the First National Bank, of the listed value of $9,000, for which they agree to deliver the following notes: [Then follows a list of the notes signed by Jans and his wife in the sum of $3,-620, other exchange notes above referred to, and bills receivable of the bank amounting to the sum of $9,000.] Said notes of H. G. Jans and G. M. Jans to be canceled. Notes of Henry Halverson and L. E. Pirsch to be assigned to H. G. Jans without recourse to the First National Bank of Oldham."

The record then goes on, naming the notes that make up the balance of the $9,000. H. G. Jans, $143.43, $144; Henry Halverson, $77.25, $72.80, $115.60, $112.90, $62.00, $400.66, $92.72; L. E. Pirsch, $280.70. It was further recited in the record that the note of $1,500 by Jans and wife was with the First National Bank of Kennebec; Henry Halverson, $2,000, $12, and $215.55, were with the same bank. Notes for $1,800 and $320, signed by Jans, were with the Reliance Savings Bank. Said notes were to be delivered as soon as received. This record was signed by the defendants.

September 12, 1922: "Motion made by E. J. Reed, seconded by Henry Menzes, that the bank pay the purchasers 6 per cent. on the money loaned on stock, as they now are on time C. D.'s, on said stock being taken over from H. G. Jans and shall be held by Thomas Duffy and H. L. Haskins until A. N. Johnson can pay for same according to contract dated August 8, 1922, and the other directors shall be equally liable on said stock same as they are under said contract. Motion carried."

The foregoing is, in substance, the entire record kept in the minutes of the meetings of the board of directors of the First National Bank of Oldham. It appears without dispute in the testimony that the First National Bank of Oldham was during all of these times in bad shape, and that the national bank examiner had told the directors that they could get rid of Jans by taking his stock into the bank and giving him in exchange for it these notes above referred to; that this transaction had for its sole purpose the making effective of this plan of the bank examiner. There nowhere appears in the record even a suggestion that either of these farmer directors or any one connected with the transaction had a thought that these directors were purchasing the Jans stock themselves, or that they were either of them incurring any liability for or on account of the Jans stock. The sole and only purpose of taking this stock was to help the bank, and it was taken with the thought that it could be sold by the bank to Johnson, electing him cashier. In all of the proceedings there is not a suggestion of any intent or purpose of the board of directors to own this $7,500 stock. The delivery was finally consummated under the direction of the bank examiner, and this $9,000 of the assets of the bank was turned over to Jans, and Jans surrendered his stock to the bank.

The record discloses with reasonable certainty that, as a matter of fact, Jans delivered his stock to the bank examiner, and the bank examiner turned it into the bank; it was indorsed in blank, placed in the vaults of the bank, and there it remained. No transfer, nor thought of transfer of this stock to either of the defendants was ever suggested, it being the plain intent and purpose of all concerned that the bank would surrender its bills receivable, signed by the cashier and his wife, and the other "exchange notes," etc., in the sum of $9,000, to Jans; that the bank would take the 75 shares and would sell them to Johnson, who was to be elected cashier. If that purpose had materialized in compliance with the resolution of the board electing Johnson cashier, if Johnson had made good upon the purchase of this stock from the bank, this lawsuit never could have been thought of. Clearly, up to that time there was nothing in the minds of any of the parties to this transaction that can under any interpretation be said to be an intent upon the part of these directors to purchase this stock personally and become responsible therefor.

The transaction itself makes that sort of a construction impossible, because the stock was not paid for with the money of these directors. The exchange of the notes, assets of the bank, was the consideration for the delivery by Jans of his stock in the bank to the national bank examiner, and by him to the bank itself. Johnson, who was elected cash-

ier by the above resolution, failed to make good and failed to pay for the stock, and on September 12, 1922, the national bank examiner objected to the depletion of the assets of the bank by the purchase of these shares by the bank and insisted that money would have to be raised in the amount of the notes taken from the bank and delivered to Jans by the bank in payment for the 75 shares of stock, and thereupon, at his request, the defendants Duffy and Haskins delivered to the bank the sum of $4,500 each, covering the entire amount of the transaction, upon which they were to receive 6 per cent. per annum interest:

"On the money loaned on stock, as they are on time C. D.'s, and said stock being taken over from H. G. Jans and shall be held by Thomas Duffy and H. L. Haskins until A. N. Johnson can pay for same according to contract dated August 6, 1922." "And the other directors shall be liable on said stock the same as they are on said contract."

Awkward in construction as this record is, I can find nothing in it that can reasonably be construed to express an intent or purpose that these defendants, Duffy and Haskins, were purchasing this stock, or that they were to have any interest in it or claim upon the stock, unless it be that the stock was to be considered security to them for the $9,000 advanced and "loaned" to the bank. The contract above referred to is referred to by witnesses as being a contract between the bank and Johnson. It is not pretended that the contract was between these defendants and Johnson, and, if these defendants were the owners of the stock, they would necessarily have made the contract to dispose of the same. It was not a part of the plan or purpose of any one that these directors should be the purchasers of the stock, nor that they should pay for it.

The stock was assigned in blank and delivered to the bank examiner, who, in turn, deposited it in the bank, as an asset of the bank, to be held until Johnson completed the transaction by taking it over and paying the bank for the same. It was still thought that Johnson would take the stock and pay $9,000 for it. He failed to perform his part of the contract, and the bank ran along until the 3d day of January, 1925, when it was taken over by the Comptroller of the Currency for liquidation, and this Jans stock for $7,500 was found indorsed in blank by Jans in the vault of the bank. No transfer of the stock was ever made by the officers of the bank upon the books of the bank to itself or to any one. It simply held the stock. No divi-

dend was ever drawn upon this stock by any of the defendants, nor is it claimed that any of the defendants ever voted the stock or exercised any ownership over it. The $9,000 thus advanced by the defendants Duffy and Haskins, at the request of the bank examiner, to replace the assets of the bank which had been exchanged for the Jans stock, was never paid by the bank or returned to them.

Upon these facts there is no controversy. This action is brought by the plaintiff to recover of the defendants, as the owners of this stock, an assessment of 100 per cent. under section 5151, U. S. R. S., as amended by Act Dec. 23, 1913, c. 6, § 23 (38 Stat. 273 [Comp. St. § 9689]).

[1-4] The adjudications of the Supreme Court are controlling authority for several of the propositions applicable to this case, as follows:

(1) The real owner of the shares of the capital stock of a national banking association may in every case be treated as the shareholder within the meaning of section 5151.

(2) Any person who holds himself out as the owner of the shares by allowing himself to appear as the registered owner thereof upon the books of the banking association may likewise be treated as a shareholder within the meaning of that section.

(3) If the real owner of the shares transfers them to another person, or causes them to be placed on the books of the banking association in the name of another person with the intent simply to evade the responsibilities imposed by section 5151 on the shareholders of national banking associations, such person may be treated for the purposes of that section as a shareholder and liable as therein prescribed.

(4) If a person receives shares of the stock of a national banking association as collateral security to him for a debt due from the owner, with power of attorney authorizing him to transfer the same on the books of the association, but being unwilling to incur the responsibility of a shareholder as prescribed by the statute, causes the shares to be transferred on such books to another, under an agreement that they are to be held as security for the debt due from the real owner to the creditor, doing so in good faith and for the purpose only of securing the payment of that debt without incurring responsibility of the shareholder, he will not be treated as a shareholder within the meaning of section 5151. Nat. Park Bank of City of New York v. Harmon (C. C. A.) 79 F. 891; Higgins v. Fid. Ins. Trust & Safe Dep. Co. (C. C. A.) 108 F. 475.

[5] These defendants, upon this record, are not liable for this assessment under either of these four well defined propositions of law. It was never intended by any of the parties to the transaction that they should be the real owners of these shares of stock; they never, either of them, held himself out as the owner of these shares of stock, nor did they allow themselves to appear as the registered owners thereof upon the books of the banking association. They were never the real owners of the shares of stock, nor did they transfer them or cause them to be transferred to any other person, nor did they cause them to be placed on the books of the First National Bank of Oldham in the name of any other person with the intent to evade the responsibilities imposed by section 5151. These defendants, nor either of them, ever received the shares of stock in question, except that it was agreed that they would be held as security for the $9,000 advanced by defendants Duffy and Haskins. No power of attorney was ever given to the defendants or either of them authorizing them to transfer the same on the books of the association, nor did they ever cause the shares of stock in question to be transferred on the books to any other person. They simply made the agreement, evidenced by the resolution that the shares were to be security for the debt due Duffy and Haskins, there being absolutely nothing in the record that questions the good faith of all concerned and the united purpose that the same should secure the payment of this debt of $9,000 without incurring the responsibility of a shareholder.

It does appear from the record that these defendants paid one or more assessments upon this stock upon the demand of the bank examiner, ordered by the Comptroller of the Currency, to make good the impairment of the capital stock of the bank, but these payments of the pro rata share of such assessments were for the protection and benefit of all interested in the pledged stock and were entirely consistent with the preservation of the security for the debt owing the defendants Duffy and Haskins, and were entirely consistent with an intent and purpose upon the part of the defendants to save the bank and protect the pledged security. Higgins v. Fid. Ins. Tr. & Safe Dep. Co., supra.

[6] There is, therefore, no liability on the part of these defendants, unless it be held that the purchase of the stock of Jans by the bank was illegal, and the transaction being ultra vires automatically the title to that stock became vested in the directors. That is the simple question here to determine. With that

I have little difficulty. In considering this question it is important to bear in mind that the 75 shares of stock purchased by the bank was not void stock, but was stock which had been issued lawfully to Jans, and had been reacquired by the bank by purchasing it from him. The purchase of this stock by the bank was, doubtless, ultra vires, but the purchase did not render the stock void. In purchasing it the bank made an unlawful use of its funds for which the officers concerned in the transaction could have been held responsible as for any other unlawful act if the First National Bank of Oldham had sustained damage. Lantry v. Wallace (C. C. A.) 97 F. 865.

In re First Nat. Bank v. Stewart, 107 U. S. 676, 2 S. Ct. 778, 27 L. Ed. 592, it is held that, if a national bank wrongfully acquires its own stock, as by making a loan thereon, no one but the government can be heard to complain if the contract has been fully executed. In the case at bar the purchase of this stock was fully consummated in 1922, nearly 2½ years before the bank was taken over by the Comptroller of the Currency for liquidation. The bank, by this transaction, paid for these certificates of stock out of its assets and received the delivery of the stock, and thereby became the owner thereof. The bank's title to this stock arose from the full performance of this ultra vires contract, and it is therefore urged by the plaintiff that it received no title. This, I think, is error, because it makes no difference to the passage of title whether or not the parties are engaged in an illegal enterprise, provided they intend title to pass and perform the requisite formalities. While the law will not compel by its construction the performance of acts promised by contract but forbidden by law, it does not change the effect of civil acts of persons merely because they are engaged in violating the law. These acts continue to have the usual consequences. Metropolitan Tr. Co. v. McKinnon (C. C. A.) 172 F. 846.

The plaintiff's contention here is that the officers of the bank in the purchase of this stock did that which they were not authorized to do, and therefore, in taking the assets of the bank and paying for these shares of stock, instead of passing the title to the bank, they were invested with the title, and became thereby vested also with the liabilities of ownership of the same. As a matter of fact, if the bank received no title to these shares of stock, and there was entire failure of consideration for the notes, assets of the bank, that were turned over to Jans, then the title, necessarily, of this stock is still in Jans, and an action

would probably lie on the part of the bank to recover back the assets delivered to Jans upon returning him the stock. Barron v. McKinnon (C. C. A.) 196 F. 933. No such question is presented here, nor can there be any recovery in this proceeding for the tort alleged to have been committed by these defendants, there being neither pleading nor proof to sustain recovery upon that ground.

Plaintiff calls my attention to Foster v. Chase and Foster v. Wilson, 75 F. 797, the same being decisions of the circuit court of Vermont, holding, in substance, that where a father bought stock and paid for it and put it in the name of a minor child, the child not having the legal capacity to accept the obligation of holding stock, the father is liable as the shareholder. The facts in that case have no application here. There the father paid for the stock with his own money and took it in the name of an incompetent person. Here the bank purchased the stock of Jans, exchanging therefor its own notes and the stock was delivered to the bank. In the case above cited the transaction was purely one of the father making the purchase. In the case at bar it was the bank making the purchase and paying for the stock out of its assets. It was the intent and purpose in the case at bar that title should pass to the bank, and that the bank would hold it for the purpose of transfer to Johnson when he fulfilled his promise to purchase the same upon his being made cashier. If Johnson had fulfilled his promise and paid the bank $9,000 for this stock, it has been repeatedly held that the bank had and could convey good title thereto. The mere fact that Johnson failed to fulfill his promise did not and could not operate to pass the title to the stock to these defendants.

The doctrine of estoppel is urged by plaintiff. This record discloses none of the elements of estoppel. The defendants did not purchase nor pay for the stock, neither did they hold themselves out as the owners of the stock; neither did they permit the stock to be carried upon the books of the corporation in their names; nor did they receive any dividends upon the stock; nor did they ever vote the stock; nor did they ever privately or publicly claim the title to or to be the owners of the stock in question. There is nothing in this record to sustain a finding that depositors ever relied or could have relied upon any act or thing done by these defendants, or either of them, with reference to said stock that could or would have misled them to their prejudice.

Defendants urge that the bank's condi-

tion was such as to bring the purchase of this stock by the bank within the permission of the statute where a past-due indebtedness has been incurred, etc., and that this purchase of this stock by the bank was for the security of the bank, and therefore, within the exception, and was not ultra vires and was a valid transaction. Counsel for plaintiff reply that, even if that be true, it was the duty of the bank to have disposed of the same within the six months' period. In the view that is taken in the foregoing statement, it is unnecessary to determine this issue. Suffice it to say that, if the transaction is within the exception of the statute, the fact that it was not disposed of within six months would not make it void. It would only subject the bank to the penalty named in the statute, and that has no relationship to the issue of ownership that is involved here.

I have therefore filed findings of fact and conclusions of law in favor of the defendants and against the plaintiff, directing that judgment of dismissal be entered, with a proper exception to the plaintiff.